In re Dixie Lee **DORSEY**, Debtor.

**AMERICAN EXPRESS TRAVEL RELATED SERVICES, INC.**, Plaintiff,

v.

Dixie Lee **DORSEY**, Defendant.

**Bankruptcy No. 90–00461–8P7.
Adv. No. 90–196.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Oct. 26, 1990.

Larry Foyle, Sandra K. Curtin, for plaintiff.

Dixie Lee Dorsey, pro se.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the matter under consideration is the dischargeability vel non of a debt admittedly due and owing by Dixie Lee Dorsey (Debtor) to American Express Travel Related Services, Inc. (American Express). The claim of nondischargeability is set forth by American Express in a three-count Complaint.

The claim in Count I is based on the allegation that the Debtor is indebted to American Express in the amount of $13,-369.46 on Account No. 3728647132–81003 (Account No. 1); that between September 27 and December 13, 1989, the Debtor, by using her American Express card in 58 separate transactions, charged $13,369.46 for luxury goods and services; that these charges were incurred by the Debtor with full knowledge of her inability to repay the charges and, as a matter of fact according

to American Express, the Debtor never intended to repay the charges. Based on the foregoing it is the contention of American Express that by virtue of Section 523(a)(2)(A), the balance owed to American Express on this account should be declared to be nondischargeable.

The claim in Count II is based on the contention that the Debtor is indebted to American Express in the amount of $10,-778.61 on Account No. 3729–133716–51005 (Account No. 2); that between September 23 and October 26, 1989, the Debtor, by using her American Express card in 14 separate transactions, charged purchases of luxury goods and services by using the American Express credit card; that the charges were incurred by the Debtor with knowledge that she is unable to repay the balance, and the Debtor never intended to repay the balance. Based on this, it is the contention of American Express that the balance on Account No. 2 should also be declared to be nondischargeable by virtue of Section 523(a)(2)(A).

The claim set forth in Count III is based on the allegation that the Debtor obtained monies from American Express by submitting a statement in writing regarding her financial condition which was materially false; that American Express reasonably relied on the information it received in the statement and in reliance, permitted the Debtor to use the card privilege and by so doing, American Express suffered damages in the amount of $24,148.07.

Although the Debtor was initially represented by counsel, who filed the Voluntary Petition on her behalf, upon Motion by counsel, which was unopposed, this Court permitted counsel to withdraw. Therefore, at the final evidentiary hearing, the Debtor appeared pro se.

The facts as established at the trial which are relevant to the claims of nondischargeability are basically without dispute and can be summarized as follows:

The Debtor is a widow and has two minor daughters. According to the Schedule of Current Income and Expenditures, she had no income during the relevant time period other than $480 per month received

from Social Security. The fact of the matter is that the Debtor has not been gainfully employed since 1978 when she worked as a nurse's aid.

It appears that during the past four years the Debtor became involved with a gentleman known only as "Jimmy Jones", which she later learned turned out to be a fictitious name. According to the Debtor, Jimmy Jones supplemented her income by paying her bills and giving her between $2,500 and $6,000 per month as spending money. Her gentleman friend was allegedly involved in extensive business undertakings in Miami involving owning and operating dog kennels and a horse farm located in Dade County, Florida. The Debtor claims that at one time, her boyfriend conveyed to her by way of a quit claim deed certain real properties for the purpose of hiding the same from his wife, with whom he was involved in a divorce proceeding. Be that as it may, it is clear from this record that the Debtor has never owned any property or any part of the business owned by the mysterious Jimmy Jones, she was not able to describe even the general nature of these businesses, and she has no idea where Jimmy Jones lives.

The Schedules filed by the Debtor reveals that over the years the Debtor obtained seven American Express credit cards beginning with what is referred to as a personal card, i.e. the green card, a gold card, each with a credit limit, and an Optima card, which apparently has no credit limit at all. Not being satisfied that the credit extended to her through these cards would be sufficient to meet her need for credit, she also collected various other credit cards, which resulted in, according to her schedules, unsecured debts totaling $106,922.39.

It appears that the Debtor, at the suggestion of her mysterious boyfriend, Jimmy Jones, embarked on an extensive overseas journey with her children visiting every country in West Central Europe, including a side trip to the Greek Islands. The cost of this trip was charged by her on a program established by American Express referred to as "Travel & Sign." It appears that under this program, a cardholder is not required to pay the entire balance of the invoice submitted but is permitted to make only minimum monthly payments. Needless to say, incidental expenses, including purchases, on this trip were charged against her American Express credit cards. These charges included, among other things, perfume purchased in Paris for $784.21. In an attempt to explain this purchase she explained that she always liked to smell good. The purchase of this item, no doubt, triggered a not-to-well smelling sour note in the not very sensitive nostrils of American Express credit card department when it received notice of the filing of the Chapter 7 Petition by this Debtor.

Upon her return, after a short rest, she embarked on a second journey, going up North, and, of course, incurred some additional charges on this trip by again using her American Express credit cards. Not willing to face the piper when the invoices started to arrive after her return, she filed her Voluntary Petition for Relief under Chapter 7 on November 17, 1989.

At the time relevant, the Debtor resided in a mobile home in Winter Haven which, according to the Debtor, was burglarized while she was in Europe. Although the Debtor claimed that she had an alarm system installed, the back door of the mobile home could not be secured and when she returned from Europe, she discovered this alleged burglary. She did not report the burglary to the police. The Debtor also claims that upon her return from the second trip, her mobile home was burglarized again, and everything of value which remained after the first burglary was removed. She claims that in both instances the culprit was "Jimmy Jones", her mysterious boyfriend who apparently decided to terminate the relationship, and who has now departed for parts unknown. The reason she did not report these burglaries was, according to the Debtor, because she was fearful that she or her children would be harmed by her former boyfriend, Jimmy Jones, if she reported these alleged burglaries to the police.

In defense of these undisputed facts, the Debtor claims that she incurred the American Express charges in good faith believing that Jimmy Jones would continue to furnish the funds necessary to meet these obligations. Moreover, she claims that it was her understanding that if she requested the travel agent to process the charges through an account operated by American Express known as "Sign & Travel", she would be permitted to pay only a minimum monthly payment upon receipt of the monthly billing and not the entire balance. There is evidence in this record that contrary to the testimony of the representative of American Express, charges for the cost of travel were in fact processed through the "Sign & Travel" account which permitted only minimum monthly payments upon receipt of the invoice. (Plaintiff's Exhibit Nos. A1–A19).

Basically these are the relevant facts established at the final evidentiary hearing which, according to American Express, the balance on Account No. 1 and Account No. 2 should be declared to be nondischargeable by virtue of Section 523(a)(2)(A) and Section 523(a)(2)(B), respectively. The claim of nondischargeability urged by American Express basically centers around the proposition that the Debtor, at the time she charged the purchases, knew that she would never be in a position to pay the charges incurred by her. Moreover, according to American Express, she never intended to pay these charges and, therefore, she obtained money from American Express by actual fraud.

This Court would be amiss not to make some initial remarks concerning this very unusual case. It is absolutely appalling to this Court and it is difficult, if not impossible, to comprehend how a responsible business enterprise like American Express would grant seven credit cards to a widow with two minor children who had no gainful employment since 1978 and whose sole regular income was, and still is, the munificent sum of $480 per month from Social Security. In defense of this astounding practice, the representative of American Express stated that as long as the cardholder meets the payment obligations, regardless of how

many, they have no problem and do not care. This explanation obviously only begs the question and never furnishes a satisfactory answer to the question, why on earth American Express issued initially seven credit cards to a person like this Debtor or any other person in a similar financial situation. Card issuers, including American Express, should not be surprised that from time to time individuals who are bombarded with unsolicited credit cards decide that so long as they have the card, they can use them and go on a charging spree without giving any thought to the fact that one day they will be called upon to repay the charges incurred.

The Court of Appeals of this Circuit had the occasion to consider the claim of nondischargeability based on misuse of credit cards in the case of *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983). This Court is not unmindful of the comments by Judge Hill, speaking for the Court, where it was stated that:

> "the element of risk is inherent in the issuance of bank credit cards. Our 'credit-card economy' encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. *In re Talbot*, 16 B.R. 50, 52 (Bkrtcy.M.D.La. 1981). Banks are willing to risk non-pay-

ment of debts because that risk is factored into the finance charges."

Notwithstanding these comments, while this Court agrees that merely exceeding the credit limit would not by itself be sufficient to form the basis of a claim of nondischargeability, fraudulent use of credit cards is another matter. Thus, if it is shown that at the time the Debtor incurred the charges he or she knew that they would be unable to live up to the obligation and pay the charges, or if it appears that they had no intention to pay the charges when the charges were incurred, that would clearly be an actual fraud thus rendering the debt incurred by using the credit card nondischargeable under Section 523(a)(2)(A).

Turning to the consideration of the claims of nondischargeability as set forth in the three-count Complaint, it is clear that it is a generally accepted proposition that the provision of the Bankruptcy Code dealing with discharge is remedial and should be construed liberally in favor of the Debtor and against one who challenges the Debtor's right to a discharge. *Lines v. Frederick,* 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970); *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *In the Matter of Bonanza Import and Export,* 43 B.R. 577 (Bankr.S. D.Fla.1984).

There is no question that the burden of proof is clearly on the party who seeks a determination that a specific obligation owed by the Debtor is nondischargeable. It should be noted however that there is no general agreement among bankruptcy courts whether the quantum of proof required to sustain this burden is clear and convincing evidence or merely a preponderance of the evidence. The question has yet to be resolved by the Supreme Court. *In re Garner,* 881 F.2d 579 (8th Cir.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 1945, 109 L.Ed.2d 308 (1990). Notwithstanding this fact, there is hardly any doubt that in this instance, the claim of nondischargeability of American Express has been established without a doubt for the following reasons:

If the Guineas Book of World Records would include the misuse of credit as a category of records in its publication, this Debtor certainly would have a fighting chance to get the first prize considering what happened in this instance. As indicated earlier, she is a widow with no income of any consequence on which she is to support two minor children, whereby using seven credit cards from American Express from others, i.e. Visa and Mastercharge, she incurred unsecured debt in excess of $106,000. There is hardly any doubt that this Debtor was fully aware that she could never meet these obligations on her income even if she lived to be 100 years old, and her reliance on the continuing generosity of her mysterious boyfriend was unrealistic and unjustified to say the least. Although this relationship lasted four years, she claims they never lived together during those four years and she was not able to find out his real identity, she has no idea where he lives, and she certainly had no basis to believe that his generosity would continue forever.

Thus, it should be evident that this is not merely a claim of nondischargeability based on misuse of a credit card by exceeding the credit limits unlike the fact pattern in *Roddenberry, supra,* but involves obtaining money by actual fraud when she had no intention to pay these charges. The fact of the matter is, when questioned about her European trip, she stated, with some pride, that she had a grand time on her trip and enjoyed every minute of it.

Based on the foregoing, it is clear that whether the burden of proof required to prove a claim of nondischargeability is clear and convincing or merely preponderance of the evidence, American Express did establish with the requisite degree of proof that the outstanding balances of Account No. 1 and Account No. 2 should be excepted from the overall protection of the general bankruptcy discharge by virtue of Section 523(a)(2)(A). However, inasmuch as there is nothing in this record to establish that the Debtor submitted a materially false statement in writing concerning her financial condition when she originally ap-

plied for her first credit card, the claim set forth in Count III of this Complaint should be dismissed with prejudice.

A separate final judgment shall be entered in accordance with the foregoing.