**In re Robert Brownell O'BRIEN, Jr. and Sarah Lager O'Brien, Debtors.**

**AMERICAN EXPRESS CENTURION BANK, Plaintiff,**

**v.**

**Robert Brownell O'BRIEN, Defendant.**

**Bankruptcy No. 94–31330–BKC–SHF. Adv. No. 94–0785–BKC–SHF–A.**

United States Bankruptcy Court, S.D. Florida.

Jan. 6, 1995.

Scott W. Spradley, Orlando, FL, David C. Tassell, Jupiter, FL, for plaintiff.

Kenneth S. Rappaport, Boca Raton, FL, for defendant.

### MEMORANDUM DECISION

STEVEN H. FRIEDMAN, Bankruptcy Judge.

This matter came before the Court November 30, 1994, for trial on the complaint of Creditor, American Express Centurion Bank ("Amex"), wherein Amex seeks, pursuant to 11 U.S.C. § 523(a)(2)(A), to except from discharge the indebtedness of $97,409.14 owed by Robert Brownell O'Brien, Jr. (the "Debtor"). Amex contends that the Debtor purchased goods and services and obtained cash advances through the use of his account with Amex, when he knew that he would be unable to repay the indebtedness incurred to Amex, thereby obtaining an extension of credit under false pretenses. The Court, having carefully considered the testimony and documentary evidence presented together with the candor and demeanor of the witnesses, concludes that Amex has proven that its claim should be excepted from the Debtor's discharge, to the extent of $13,-475.00.

The Debtor is a financially sophisticated individual who was the chief executive officer of Carteret Savings Bank ("Carteret") between 1975 and June, 1991, and also served as Carteret's chairman of the board of directors until 1989. During his tenure with Carteret, the Debtor made substantial use of his Amex account, carrying account balances on his line of credit of as much as $40,000.00 to $60,000.00, but almost always paying the minimum monthly balance due. On occasion, the account balance would be substantially reduced or eliminated with lump-sum payments of between $20,000.00 and $60,000.00. The Debtor was earning an annual salary from Carteret of $621,000 prior to June, 1991, when the Debtor's employment with Carteret was terminated.

Shortly thereafter, the Debtor obtained employment with the Printon, Kane Group, Inc. ("Printon, Kane"), an investment firm specializing in the sale of municipal securities. However, his income was drastically reduced, allowing the Debtor to receive a $125,000.00 draw against commissions earned and/or to be earned on securities sales. The relationship with Printon, Kane did not prove particularly fruitful. By the end of 1992, the Debtor's annual draw was reduced to $50,-000.00. Also, the Debtor's efforts, as the new business development coordinator of Printon Kane, failed to generate even a single commission earned during the Debtor's two-year tenure at Printon, Kane.

In addition to the income earned from Printon, Kane, the Debtor did generate other sources of income. In 1992, he was retained by Governor's Bank for a special assignment, and received a fee of $35,000.00. In 1993, the Debtor served as a director of First Mortgage Capital Group and received monthly directors' fees of $2,000.00 for a nine-month period. He also received compensation for services provided to Seaton Corporation during 1993. By the end of 1993, however, the Debtor was unemployed.

With no immediate employment opportunities available, the Debtor decided to broaden his involvement with the Palm Beach Maritime Museum (the "Museum"). The Debtor, already serving as a member of the Muse-

um's Board of Directors, believed that by expanding the scope of his involvement with the Museum, he would be able to obtain a salaried position with the Museum, or at least earn commissions upon sales of the Museum's rehabilitated vessels. As the Debtor's efforts on behalf of the Museum expanded, it became necessary for the Museum to expend funds in the rehabilitation of its vessels. However, the Museum, ostensibly an eleemosynary institution, did not possess the financial wherewithal to fund the needed repairs. Thus, starting in late October, 1993, the Debtor embarked upon a series of transactions, through the use of his Amex account, to assist the Museum in its rehabilitative efforts. Between October 27 and November 24, 1993, the Debtor incurred new charges, all on behalf of and for the benefit of the Museum, in the aggregate amount of $15,136.29. The Debtor incurred additional charges on behalf of the Museum in December, 1993, of at least $3,000.00. By January, 1994, the Debtor owed in excess of $95,000.00 on his Amex account.

In his defense, the Debtor asserts that he always intended to repay his obligation to the Plaintiff, and that it was not unusual for him to carry large debit balances on his Amex account. In addition, the Debtor asserts that pursuant to his agreement with John Grant, the president of the Museum, the Debtor was to be repaid for the monies which he advanced on behalf of the Museum. This agreement was not, however, memorialized in writing, and there is no evidence of any repayments by the Museum as to the funds advanced by the Debtor. Ultimately, the Museum was unable to repay any portion of the sum of approximately $22,000.00 advanced by the Debtor on behalf of the Museum, and the monies advanced by the Debtor were characterized as charitable contributions, to enable the Debtor to take a tax deduction on his federal tax returns.

The Debtor acknowledges that his efforts on behalf of the Museum were not entirely altruistic. Rather, he hoped that as a result of his ship-repairing talents, he ultimately would land a salaried position with the Museum. While such activities might appear virtuous, the Debtor's argument ignores the fact that after December 15, 1993, he became an unemployed former bank officer/bond dealer of advancing age, thereby possessing skills of limited marketability.

■ Amex's case is predicated upon its position that, at some point in time during the course of the Debtor's continued use of his Amex account, he knew or should have known that he would be unable to repay the charges incurred on the account. This Court subscribes to the theory that purchases of goods on credit by a debtor who has no reasonable expectation of being able to pay for them constitutes a false representation under 11 U.S.C. § 523(a)(2)(A). *In re Schartner,* 7 B.R. 885 (Bankr.N.D.Ohio 1980). In order to establish that a debt is non-dischargeable under Section 523(a)(2)(A) the creditor must prove:

(1) That the debtor made a false representation with the purpose and intent of deceiving the creditor;

(2) That the creditor relied on the representation;

(3) That the creditor's reliance was reasonably founded;

(4) That the creditor sustained a loss as a result of the representation.

*In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986). The plaintiff must prove each of these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755.

■ This Court is cognizant of the ruling by the Eleventh Circuit Court of Appeals in the case of *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (1983), whereby the Court, interpreting § 17(a)(2) of the Bankruptcy Act, held that only after a bank had made a clear revocation of credit card privileges to a card holder could the Debtor be deemed to have obtained extensions of credit by false pretenses or false representations. Several courts have distinguished *Roddenberry* by holding that while exceeding credit limits would not necessarily be a basis for an exception to discharge, the fraudulent use of a credit card would except such debts from discharge. *In re Cacho,* 137 B.R. 864 (Bankr.N.D.Fla.1991); *In re Rodriguez,* 138 B.R. 112 (Bankr.S.D.Fla.1992); *In re Dorsey,*

120 B.R. 592 (Bankr.M.D.Fla.1990). As stated in *Dorsey:*

> Thus, if it shown that at the time the Debtor incurred the charges he or she knew that they [sic] would be unable to live up to the obligation and pay the charges, *or if it appears that they [sic] had no intention to pay the charges when the charges were incurred, that would clearly be an actual fraud* thus rendering the debt incurred by using the credit card nondischargeable under Section 523(a)(2)(A).

*Id.* at 596. Such a determination necessarily entails an analysis of the Debtor's state of mind at the time the questioned charges were incurred. The Ninth Circuit Bankruptcy Appellate Panel, in the case of *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988), set forth a non-exclusive list of factors for trial courts to consider in determining whether credit card debt was incurred through actual fraud. The considerations delineated are as follows:

(1) The length of time between the charges made and the filing of bankruptcy;

(2) Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

(3) The number of charges made;

(4) The amounts of the charges;

(5) The financial condition of the debtor at the time the charges are made;

(6) Whether the charges were above the credit limit of the account;

(7) Whether the debtor made multiple charges on the same day;

(8) Whether or not the Debtor was employed;

(9) The debtor's prospects for employment;

(10) The financial sophistication of the debtor;

(11) Whether there was a sudden change in the debtor's habit; and

(12) Whether the purchases were made for luxuries or necessities.

*Id.* at 657.

██ An application of the above factors leaves this Court to conclude that the charges incurred by the Debtor after December 15, 1993, were incurred with fraudulent intent. The Debtor incurred a $13,475.00 in credit card charges shortly after his December 15, 1993 termination from the Printon, Kane and from First Mortgage Capital Group. As the former chief executive officer of Carteret, this Debtor possessed a high level of financial sophistication. In addition, he had consulted with his bankruptcy counsel on at least three separate occasions between April, 1993 and March, 1994. Given the Debtor's level of financial sophistication, this Court concludes that the Debtor knew, after December 15, 1993, that he would be unable to pay for the credit card charges incurred on his Amex account. As noted by Judge Hill in his analysis in *Rodriguez,*

> [T]his court is convinced that when the Debtor obtained the various cash advances through the use of the credit cards issued by Citibank, he knew that he did not have the present ability nor the future realistic possibility to pay off the debts incurred. Such conduct establishes the elements of false pretense with intent to deceive.

*Rodriguez* 138 B.R. at 115. Similarly, when Debtor incurred an additional $13,475.00 in charges upon his Amex account between December 15, 1993 and December 29, 1993, and after his employment had been terminated, he did so knowing that he had neither the present or future ability to pay these charges.

Although it was not unusual for *this* Debtor to owe a balance of upwards of $70,000.00 on the account, the Debtor's loss of employment with Printon, Kane and the termination of his tenure as a director of First Mortgage Capital Group in Mid–December, 1993 should have made him realize the seriousness of his financial difficulties. Instead, the Debtor continued to obtain extensions of credit on his Amex account, to the extent of $7,475.00 between December 15 and December 23, 1993, with an additional $6,000.00 of credit extensions in January, 1994. Accordingly,

the Court finds that, to the extent of $13,-475.00 the credit card charges incurred by the Debtor were incurred with the purpose and intent of deceiving Amex.

██ However, the charges incurred before December 15, 1993 are dischargeable. Until then, the Debtor remained gainfully employed, albeit at a reduced income level. Although the Debtor had significantly increased the balance due the Plaintiff from approximately $41,000 in July, 1993 to approximately $74,000.00 in early December, 1993, the Court does not find such charges to be unusual, or more particularly, probative of a fraudulent intent to deceive creditors. The Court does not believe that the charges incurred by the Debtor between July, 1993 and December 1993, were obtained by false pretenses, i.e. without an intent to repay such charges. Rather, the Court accepts the testimony of the Debtor that, on various occasions, he would incur substantial charges on his Amex charge account, only to significantly reduce said charges from time to time with a lump sum payment. In addition, while the Debtor substantially increased the balance due Amex between July and December, 1993, he consistently made his minimum monthly payment due on his account. If the Debtor harboured no intention to pay for the charges, he would not have continued to make his minimum monthly payments. The Court accepts the Debtor's testimony that he did not intend to defraud the Plaintiff with regard to the credit card charges incurred relating to his involvement in the Museum prior to the termination of his employment. Although the Debtor did incur in excess of $35,000.00 in credit card charges between July and December, 1993 relating to his activities on behalf of the Museum, the Debtor reasonably expected to be repaid for these charges, either directly by the Museum, or indirectly from proceeds generated from the sale of the relocated vessels belonging to the Museum.

Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate judgment will be entered determining the indebtedness due to American Express Centurion Bank by Robert Brownell O'Brien, Jr. to be non-dischargeable, to the extent of $13,475.00. Costs may be taxed upon motion.

**ORDERED.**