**In re Michi NOGAMI, Debtor.**

**FLINT AREA SCHOOL EMPLOYEE CREDIT UNION, Plaintiff,**

**v.**

**Michi NOGAMI, Defendant.**

**Bankruptcy No. 88–1677–BKC–6S7.**
**Adv. No. 88–343.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

May 31, 1990.

Larry Foyle, Kass, Hodges & Massari, Tampa, Fla., for plaintiff.

Frank M. Wolff, Maitland, Fla., for defendant.

## MEMORANDUM OPINION

W. DONALD BOE, Jr.*, Bankruptcy Judge.

Flint Area School Employee Credit Union (Plaintiff or Credit Union) filed this adver-

sary proceeding to object to discharge of credit card debt owed by Debtor Michi Nogami (Defendant or Nogami). $16,006.80 in debt was incurred by credit card transactions on and after December 20, 1987, with virtually all of these charges made during a ten (10) day period with a card having a $2,000 credit limit. After trial, the court finds that this debt was created through actual fraud and that the Credit Union did not act improvidently or encourage the Debtor to spend beyond her means. The debt incurred on and after December 20, 1987, and contract interest thereon of $5,919.01, is nondischargeable under Sec. 523(a)(2)(A) of the Bankruptcy Code. The debt of approximately $2,000 incurred prior to December 20, 1987 is dischargeable since there is no clear and convincing evidence of fraud prior to that date.

In February 1984, Michi Nogami applied for and obtained a Visa card from the Credit Union. The credit limit was $2,000. Between February 1984 and November 1987, Defendant's use of the card was generally within the credit terms and with payments in compliance with the credit agreement. Beginning on December 20, 1987, and after Defendant had decided to file bankruptcy, a unique pattern of abuse emerged. Over 450 charges were made on the card. All but one were under $50. In a number of instances where the total bill at a particular establishment was well over $50, it was split into two or more separate charges that were under $50. Charge slips were signed by Defendant and her then husband, Luther Campbell, both signing as Michi Nogami. The charge slips and billing statements show that Defendant and her husband made about 45 charges per day for ten days at various retail stores, hotels, restaurants, gas stations, and the like.

Although Defendant made $35,000 per year when she originally applied for the card, her income had dropped by the time of the shopping spree. At that time, she

---

* U.S. Bankruptcy Judge, Western District of Louisiana, sitting in the Middle District of Florida on intercircuit assignment approved by the Chief Judges of the Fifth and Eleventh Circuits.

was receiving approximately $900 a month in disability compensation. Her husband was also unemployed and had been so for at least two years. He was also on disability or workmen's compensation and receiving about $1,000 per month. Defendant did own several jewelry stores, some of which may have been profitable, but which as a whole, were operating at a loss.

█ Sec. 523(a)(2)(A) provides that a discharge in Chapter 7 does not discharge an individual debtor from any debt for money, property, or services, or an extension, renewal or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud. To succeed under this provision, a creditor can prove by clear and convincing evidence that:

1. The debtor engaged in representations which the debtor either knew to be false, or with such reckless disregard for the truth as to constitute willful misrepresentation;

2. The debtor acted with intent to deceive;

3. The creditor actually relied on the false representation and sustained loss or damages as a result thereof.

*Chevy Chase F.S.B. v. Hable (In re Hable)*, 101 B.R. 773 (Bankr.M.D.Fla.1989) and *Chevy Chase F.S.B. v. Hall (In re Hall)*, 101 B.R. 781 (Bankr.M.D.Fla.1989) and the cases cited therein. On the 11th Circuit, a plaintiff must prove an *overt* false representation or false pretense to obtain an exception to discharge on these grounds. A defendant's mere failure to disclose will not suffice. *Schweig v. Hunter, (In re Hunter)*, 780 F.2d 1577, 1580 (11th Cir. 1986).

█ Actual fraud is the remaining basis for an exception to discharge under Sec. 523(a)(2)(A). Actual fraud consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another— something said, done, or omitted with the design of perpetrating what is known to be a cheat or deception. 3 Collier Sec. 523.-08[5] (15th ed. 1989). When a debtor uses a credit card with no intention to pay the charges, there is actual fraud. *Chase*

*Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724, 731–732, 13 C.B.C.2d 1158, 1163 (Bankr.N.D.Ga.1985). The major issues in this adversary proceeding are whether Nogami did not intend to pay the charges, and if she did not, whether she must nonetheless prevail under *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 10 B.C.D. 469 (11th Cir.1983), because the charges were made before the card was revoked.

In determining whether a debtor intends to pay credit card charges, the courts have considered such factors as these:

1. The length of time between the charges and the filing of bankruptcy;

2. Whether an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges;

4. The amount of the charges;

5. The financial condition of the debtor when charges were made;

6. Whether the charges exceeded the credit limit of the account;

7. Whether there were multiple charges on the same day;

8. Whether the debtor was employed;

9. The financial sophistication of the debtor;

10. Whether the debtor's spending habits suddenly changed;

11. Whether the purchases were made for luxuries or necessities.

*First Fed. of Jacksonville v. Landen, (In re Landen)*, 95 B.R. 826, 828, 18 B.C.D. 1422, 1424, 20 C.B.C.2d 731, 735–736 (Bankr.M.D.Fla.1989); *Carpenter, supra*, 53 B.R. at 730.

█ Consideration of these factors compellingly demonstrates that Defendant intended to deceive and engaged in trickery through the device and artifice of making multiple charges of less than $50 to conceal from the credit card system the extent of her purchases. Although the bankruptcy was not filed until more than five months after the buying spree, the debtor's own testimony reveals that just prior to the

spree she was at least considering bankruptcy and had consulted an attorney regarding possible filing. The number of charges made, the manner in which they were made, and the total amount charged show a clear and convincing intent to defraud. In less than ten (10) days, Debtor and her husband spent about $16,000 on an account with a $2,000 limit, by making approximately 450 charges, an average of 45 charges per day. The Defendant's husband testified that they were running from one point of purchase to the next.

The manner in which charges were made evidences fraudulent intent. The charge slips and billing statements show up to 14 charges under $50 made at the same store on the same day. Purchases over $50 were also divided into numerous under $50 charges. Defendant offered no reasonable explanation for this behavior. Mr. Pat Hagedorn, the Credit Union's Operations Manager, explained that Visa charges under $50 go through a first level check only to determine if the card has been reported lost or stolen. Defendant had over 5 years of retail experience. She operated stores which accepted Visa and Mastercard. Visa and other credit card representatives had demonstrated to her in connection with her businesses how the credit card equipment worked and had explained credit approval and other policies. That Defendant with her retail experience and a Ph.D. from the University of Michigan did not know the significance of charges under $50 is incredible.

Defendant and her husband were receiving a total of about $1,900 per month in disability or workers' compensation payments. There is no reasonable explanation of how the charges could be paid and clear and convincing evidence that they could not be. It is not argued that the charges were made for necessities. The charges were made mostly in the Orlando area at toy stores, department stores, and other retail outlets, for luxury merchandise and gift certificates. The spree represents a drastic change from prior use of the card.

These facts adduced at trial constitute extremely damaging evidence of actual fraud on the part of Defendant. However, the court must consider the totality of the evidence. What makes this case additionally unusual is Defendant's contention that she could not have had the requisite intent to defraud. She claims her actions were out of fear of her husband, Luther Campbell, whom she says abused and threatened her mentally and physically. The court denied the Credit Union's motion *in limine* to exclude such evidence.

Defendant testified that en route to Florida with Campbell and their two children, she used the card on December 19th to buy gas. She would have the court believe that Campbell previously was unaware that she had this or other credit cards. She claims she kept them hidden from him and that upon his becoming aware of this card he forced her to join in his scheme of fraud. She also testified that she did not call the Credit Union or any law enforcement agency because she was afraid of her husband who would not let her use the phone.

The court finds it incredible that Campbell would not have known that his wife had this or other credit cards until December 1987. The record reflects that he spent much of his time at home taking care of the children and had daily access to the home mail where the billing for various credit cards was received. He is well educated, with a master's degree, and ran his own business for a time. The court believes his testimony that he knew his wife had credit cards and finds no evidence to support Defendant's story that a "discovery" of the Visa card by Campbell enabled him to launch a scheme that he previously had no means of pursuing.

Defendant's testimony seems largely governed by whatever suits her at the moment. At one point she claimed that she had no idea of the amount of charges being made and that she believed she could pay them. At another point she testified that she could not believe that the charges were still "going through" (being accepted). At the Section 341 meeting of creditors, she offered a different explanation—that her husband's relatives had used the card without her knowledge. She admitted on cross-

examination that this was not true. She also admitted that her Section 341 meeting testimony that she had signed no charge slips was untrue.

■ The court finds more substantially credible the testimony of her husband, Campbell, that he and his wife acted in unison with no intention of paying. This is well-supported by the Defendant's consultations with an Ohio attorney who advised her in Ohio to file bankruptcy in Florida, the amount of charges accumulated with no reasonable basis for believing they could be paid, and the scheme of multiple charges under $50 each. While many charge slips have hurried or unreadable signatures, the legible slips alone reflect that Defendant herself signed approximately $5,000 in charges, and that the card was used back and forth between husband and wife daily. The credit card agreement makes Nogami as card holder liable for all use she authorized. Defendant's testimony that she did not know the amount of the charges and intended to pay them is unpersuasive. A Ph.D. with substantial retailing experiences cannot participate in a shopping spree that generates almost $16,000 in debt at retail stores, toy stores, electronic shops, clothing stores, and not have a good idea of its magnitude. Defendant clearly had the experience and sophistication to comprehend the scheme, and to understand that nearly non-stop use of the credit card would leave the family unable to pay the bills. Indeed, this court is convinced that neither Nogami nor her husband ever intended to pay any of the bills incurred on and after December 20, 1987. They were moving to Florida from the upper Middle West where the Credit Union was located, and, based on Campbell's credible testimony, believed that these debts would be discharged in bankruptcy.

■ The court is aware that Defendant and Campbell at the time of trial had recently been divorced and engaged in a custody battle over the children, but the court finds her testimony far less credible than his. Her testimony that Campbell tried to control her life completely is inconsistent with her testimony that she ran her own businesses in different states, was the only authorized signator on her business accounts, made trips by herself, and that Campbell never even opened the mail. Her testimony is also inconsistent with her advanced educational level and ability to file three divorce actions against previous husbands.

Nogami testified that Campbell abused her physically every 3 or 4 months, and that he knocked her down in a mall parking lot when she refused to make any more charges. Campbell denies emphatically that he ever physically abused her. Letters written by Campbell to Nogami during a time of separation prior to divorce do refer to "family violence" and might support a position that he physically abused her on at least one occasion during the marriage, however, the letters are very vague. Campbell denied at trial that "family violence" meant physical abuse. Based on the court's observation of Campbell during the two day trial in this case, and its reading of his letters, the court believes that Campbell is given to reading and introspection in matters of psychology and has used the term "violence" in a restricted sense, generally to refer to family arguments in which both were active and to incidents involving verbal abuse. The guardian ad litem connected with the divorce proceedings testified that he believed Michi had been physically abused. However, this witness, a lawyer, had no training in psychology or psychiatry and was clearly not an expert. Moreover, he gave no real explanation of what he meant by abuse or explained the facts on which his opinion was based.

The court can give little if any weight to Nogami's contentions that she acted under duress and does not believe that abuse in any form was a causative factor at any stage of the shopping spree. The court is firmly convinced that Nogami believed she had nothing to lose and that the debts would be discharged in bankruptcy. Nogami's allegations of abuse must be considered against the backdrop of her other testimony, already alluded to, of various inconsistent assertions under oath indicat-

ing that her testimony is highly untrustworthy. She was also very evasive in responding to questions. The evidence in this case additionally shows that she (1) concurrently held, for purposes not disclosed on the record, multiple drivers licenses (even in the same state) with different names and social security numbers for herself and different types of make-up and hairstyles; (2) had different social security numbers, with one card confiscated by federal agents; (3) filed an insurance claim for furs asserted to be stolen at the time of the credit card spree (but which Campbell claims were merely hidden), failed to report the theft in her bankruptcy papers, and then also failed to report to the bankruptcy trustee the receipt of $10,000.00 in insurance proceeds; (4) failed to declare in her bankruptcy papers a safety deposit box she had under the name of another person in Flint, Michigan; and (5) listed absolutely no jewelry in her Statement of Affairs even though she personally used considerable jewelry and operated jewelry businesses.

■ This court finds no credible evidence that Nogami did not voluntarily participate in the credit card scheme. She knowingly, intentionally, and voluntarily with her husband engaged in a scheme to trick the Credit Union. The facts of this case are readily distinguishable from those of *Leone v. Shane (In re Shane)*, 80 B.R. 240, 16 B.C.D. 1112 (Bankr.S.D.Fla.1987) involving "a typical mother and wife who did not know of, and could not have known of, her husband's dealings....". In this case, Nogami not only had actual knowledge of the fraud being committed, she had significant involvement and control in it. That her husband worked in concert with her is no excuse. Because of her active involvement, there is no need to engage in any strained theory to impute liability to her vicariously in an artificial manner based upon the marriage relationship and/or mere receipt of the benefits of fraud. *See* Anthony M. Kennedy's opinion in *La Trattoria v. Lansford (In re Lansford)*, 822 F.2d 902, 16 B.C.D. 496, Bankr.L.Rep. Par. 71,917 (9th Cir.1987).

■ The elements of Sec. 523(a)(2)(A) otherwise having been established by clear and convincing evidence, the only remaining issue is whether *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 10 B.C.D. 469 (11th Cir.1983), prevents a nondischargeability finding.

In *Roddenberry*, the bank extended the credit limit on two cards to $1,000 in May 1978. At that time the Roddenberrys' balance was already $1,620. By August, the bank had sent three letters notifying them that their balance exceeded the credit limit. In September, the bank telephoned Mr. Roddenberry who promised to make no more charges. In October 1978, the couple separated. Mrs. Roddenberry kept the cards. By November she had increased the balance to $2,500 by obtaining cash advances through automatic tellers. The bank's response was yet more phone calls to the Roddenberrys. In December 1978, the bank programmed its automatic tellers and advised the National Authorization Center for Bank Americard/Visa to instruct merchants calling for authorization to pick up the cards. Mrs. Roddenberry then stopped obtaining cash advances and engaged in the "creative" practice of purchasing items under $50. *Roddenberry* noted that merchants generally are required to call for authorization only if the total purchase price of a sale exceeds $50. During January 1979, Mrs. Roddenberry made 91 charges under $50 raising the indebtedness to $5,221.77. A bank official contacted Mr. Roddenberry who assured him that he would try to recover the cards from his estranged wife. The couple filed bankruptcy petitions on March 2, 1979. The balance on that date was $7,050.55.

The specific question in *Roddenberry* was whether Mrs. Roddenberry's purchases and cash advances were obtained by false pretenses or false representations within the meaning of Sec. 17(a)(2) of the Bankruptcy Act. The bankruptcy trial court found that under *Davison–Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir.1940), *cert. denied* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), the debts were dischargeable because of lack of actual overt false pretenses or false representations.

The Court of Appeals however decided against mechanically applying the much criticized *Davison–Paxon* rule and closely examined the facts of that case.

The Court of Appeals panel in *Roddenberry* noted that *Davison–Paxon* involved a one on one, direct debtor-creditor relationship in a controlled environment in which the debtor's liabilities to the creditor gradually increased over a three-year period of continuous dealings during which the creditor with knowledge of the situation unwisely extended credit. *Roddenberry* found this different from an arrangement with a third party creditor which has less control over the use of a credit card. However, analysis was still to be guided by the principles of *Davison–Paxon* that discharge exceptions are to be narrowly construed and that improvident creditors are not to be afforded special protections in bankruptcy for the assumption of common business risks. The *Roddenberry* panel explained that mere breach of credit conditions by a debtor is of minimum probative value on the issue of fraud because banks often encourage and willingly suffer credit extensions beyond contractual credit limits because of high finance charges in typical credit transactions. It found that because this risk is voluntary and calculated, Sec. 17(a)(2) of the Bankruptcy Act should not afford additional protection for those who unwisely permit or encourage debtors to exceed credit limits. With these various circumstances in mind, it held that the card issuer's voluntary risk assumption continues until the card has unequivocally and unconditionally been revoked and the cardholder made aware of revocation. Only after such clear revocation has been communicated to the cardholder would further use of the card result in liability for false pretenses or false representations within the meaning of Sec. 17(a)(2). The court reasoned that purchases made with knowledge that one is not entitled to use or possess the card constitute the type of deception intended to be exempted from discharge. This would be more than an intentional concealment of insolvency; it would be affirmative misrepresentation that one is entitled to use and possess the card.

Defendant contends that *Roddenberry* makes all debt in this case dischargeable because charges were incurred prior to revocation and communication of revocation to the cardholder. However, *Roddenberry's* language should be read in the context of the facts before the court and the rationale and purposes of its decision. The first paragraph of *Roddenberry* which summarizes the opinion, states that debts incurred prior to unconditional revocation "may" be dischargeable. The court apparently did not intend a *per se* rule that would discharge all pre-revocation credit card debt regardless of the facts of the case. *See Chevy Chase F.S.B. v. Hable (In re Hable)*, 101 B.R. 773 (Bankr.M.D.Fla.1989); and *CitiBank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653 (9th Cir. B.A.P. 1988). The purposes of the *Roddenberry* decision were (1) to avoid awarding creditors that make idle attempts to prevent cardholders from exceeding their limits or that encourage or promote imprudent spending, and (2) to prevent shifting the burden of proof to the debtor through doctrines of implied misrepresentation that would undermine the principle that discharge exceptions are to be narrowly construed.

None of the purposes would be served by granting a discharge of post December 19, 1987 debt in this case. The Credit Union, unlike the bank in *Roddenberry*, did not sit by for months watching the debtor's balance grow. The debt soared by about $16,000 in about ten days. This court accepts Mr. Hagedorn's testimony on behalf of the Credit Union that it did not become aware of even the first day's highly unusual charges until the spree was nearly over. *Roddenberry* assumes that there is some action the card issuer could have taken to protect itself. This was not the case here.

Mr. Hagedorn testified that charges under $50 go through first level, or base level, authorization. This informs the merchant if a card has been lost or stolen. Even if the merchant has electronic access to the base level network, this does not result in a check on the cardholder's balance. There was considerable additional

testimony by the Credit Union about its collection efforts. The court is satisfied that there is nothing the creditor could have reasonably done to protect itself against these charges. ·

Mr. Hagedorn explained that when an account exceeds its limit a 308 notice is generated by the VISA computer system. The 308 notices provide information on accounts with high balances or unusual activity such as more than five charges in a single day. The Credit Union first received 308 notice on the Nogami account by mail on December 28, 1987. It showed 8 charges, which put the account only slightly over its limit. Attempts to contact Nogami by telephone began immediately. The Credit Union also contacted merchants that had honored the card. During the following two weeks, 308 notices on the Nogami account were triggered daily. There was an eight day lag between the charges and receipt of the 308 notice due to the normal constraints of the Visa system and the fact that the charges occurred during the holiday season when the Visa system and the U.S. Mail are most taxed. The full extent of the damage registered over the course of about two weeks and almost all of it had already occurred when the first 308 notice was received by the Credit Union on December 28, 1987.

The Credit Union put a pick up code on the card on December 29, 1987, the day after the first 308 notice was received. This would have been effective in recovering the card if charges had been over $50, for they would have been called in. On January 12, 1988, the Credit Union issued a Card Recovery Bulletin instructing merchants to pick up the card no matter how small the charge. But the spree had stopped on the 1st of January. The Credit Union responded in the most effective way that it could. To issue a Card Recovery Bulletin is more effective than attempting to track down the cardholder, particularly one in transit like Nogami, to advise that the card had been revoked.

*Roddenberry* was written partly to avoid rewarding improvident creditors. In this case, the Credit Union did not act improvi-dently in issuing a card to Ms. Nogami or in protecting itself afterwards. The Credit Union did not watch the balance grow. The balance grew so quickly and through such trickery that the Credit Union could not have prevented it. *Roddenberry* was also written to avoid application of an implied misrepresentation theory that would have shifted from the creditor the burdens of proving the elements of nondischarge-ability by clear and convincing evidence.

*Roddenberry* was also decided under the Bankruptcy Act. Sec. 17(a)(2) of the Act, unlike Sec. 523(a)(2)(A) of the present Bankruptcy Code, did not refer to actual fraud. In a footnote the court acknowledged that this difference might alter the outcome in certain cases where debtors obtained credit without a present intention of repayment. The court further noted that at least one commentator had suggested that Congress' addition of "actual fraud" to the false pretenses and false representation language of Sec. 17(a) was intended to eliminate the distinction between overt and implied misrepresentation drawn in *Davison–Paxon*. *Id.*, citing Zaretsky, The Fraud Exception to Discharge Under the New Bankruptcy Code, 53 Am.Bankr.L.J. 253, 257 (1979). However, *Roddenberry* expressly chose to express no opinion on how Sec. 523(a)(2)(A) should be construed.

The *Roddenberry* court did not deal with actual fraud. *Davison–Paxon* read Sec. 17(a)(2) of the Bankruptcy Act literally to require proof of an overt act constituting false pretenses or false representation. *City National Bank of Baton Rouge v. Holston (In re Holston),* 47 B.R. 103 (Bankr.M.D.La.1985). The addition of actual fraud expands the scope of non-dischargeable debts to include intentional or conscious tricks or deceits not involving an overt misrepresentation. *Id.* Thus, while use of a credit card may not impliedly represent that the debtor has the ability to pay, actual fraud can nevertheless prevent discharge of debt when, as here, credit card purchases are made with no intention to repay. *Sears, Roebuck & Co. v. Faulk (In re Faulk),* 69 B.R. 743 (Bankr.N.D.Ind. 1986).

Michi Nogami with the help of her husband incurred $16,006.80 in debt by actual fraud. That she was not informed that the card had been revoked is irrelevant under these circumstances. *See Hable, supra,* 101 B.R. at 774; *Hall, supra,* 101 B.R. 781. She intended to euchre the Credit Union by incurring a large amount of debt in a small amount of time neither intending nor able to pay for it. Having found actual fraud to exist by clear and convincing evidence, the indebtedness is nondischargeable under Sec. 523(a)(2)(A). A judgment consistent with this memorandum opinion is being signed this day.