**In re Stanley J. GROCKI, Debtor.**

**FIDELITY SERVICE COMPANY, a Division of F.M.R. Corp., Plaintiff,**

v.

**Stanley J. GROCKI, Defendant.**

**Bankruptcy No. 91–32455–BKC–RAM. Adv. No. 91–1204–BKC–RAM–A.**

United States Bankruptcy Court, S.D. Florida.

March 12, 1992.

Jeffrey H. Rosenthal, Boca Raton, Fla., for debtor.

Keith J. Merrill, Coral Gables, Fla., for plaintiff Fidelity Service Co.

---

* United States Bankruptcy Court for the Western District of Kentucky, Sitting by Designation for the Southern District of Florida at West Palm Beach.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, JUDGMENT

J. WENDELL ROBERTS, Chief Judge.*

This matter came on for trial before the Court on March 3, 1992. The Court heard testimony of the parties and witnesses and observed their demeanor and candor. Voluminous documentary evidence was received and reviewed by the Court. The Court also reviewed the written opening statements filed by counsel, heard their arguments and reviewed the cases cited by them. Based upon the testimony, exhibits and what the Court understands the law to be, the Court makes the following Findings of Fact and Conclusions of Law:

This Adversary Proceeding was brought by the Plaintiff, Fidelity Service Company, a Division of F.M.R. Corp. ("Fidelity"), pursuant to Bankruptcy Rule 7001(6) alleging a cause of action under 11 U.S.C. § 523(a)(2)(A). Jurisdiction is vested in this Court by 28 U.S.C. 1334(b) and by general order of the United States District Court for the Southern District of Florida. It is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

The Defendant, Stanley J. Grocki ("Grocki"), filed a Chapter 7 bankruptcy petition on August 21, 1991 in the Southern District of Florida. A year prior to that time, Grocki was a resident of New Hampshire.

While the testimony of Grocki at trial was not consistent in many respects with his deposition testimony of January 23, 1992, the evidence establishes that Grocki is a middle aged single man with a high school education. He attended a junior college around 1966 for about two years and while there studied business administration. After college he worked for several years as a telemarketing supervisor and later as an insurance salesman. His last employer in New Hampshire, IDS, hired him as a financial planner. His title was perhaps benevolent, however, as he was

still primarily an insurance salesman. He did admit in his deposition that he sometimes advised customers concerning their dealings with banks and financial institutions. During the twelve (12) months prior to filing for bankruptcy, Grocki maintained savings, checking and brokerage accounts with several financial institutions in at least two states. He owned and managed rental property, had previously earned over $50,000.00 per year and in his application to open accounts with Fidelity in March 1990, he claimed to have a net worth of $625,-000.00. Grocki was unemployed for much of 1990, having worked only briefly for IDS.

Based upon Grocki's education, experiences and background, as well as the Court's over all assessment of his demeanor and testimony at trial, the Court concludes that he was a man who was capable of, and who did know, the extent and value of his assets and liabilities at all times.

On February 15, 1990, Grocki opened a Daily Income Trust (USA Account) with Fidelity, which was essentially a checking account. It was opened with a balance of $5,011.65 and on February 16, 1990, he deposited an additional $45,000.00 to that account. The first statement issued by Fidelity on the account covered a period of time beginning with the opening of the account through February 23, 1990. It reflected a transfer of $2,121.25 on February 23 for the purchase of securities (Wang Labs). The balance in the USA account was $47,890.40.

The next month, on March 6, Grocki opened an account called Spartan Money Market Fund with Fidelity. The Spartan Money Market Fund was an investment account and it was opened by a transfer of $40,000.00 from the USA account. During the month of March, Grocki wrote thirty-two (32) checks totalling $10,159.58 on his USA account and made deposits to his USA account of $12,100.10. Less than $100.00 of income was earned on his accounts. His March 30, 1990 statement reflected balances of $9,929.76 in the USA account, $2,875.00 in the securities and $40,000.00 in the Spartan Money Market Fund, for a grand total of $52,804.76.

For the entire six month period prior to the events which give rise to this litigation, his high monthly closing balance for the combined accounts was $52,804.76 and the low monthly closing balance was $49,-781.21. There was *no* activity in his Spartan Money Market Account other than the posting of interest income for a four month period of time prior to August 1990. Grocki admits he did not make additional deposits to the Spartan Money Market Account during that four months.

All of the events herein complained of under 11 U.S.C. § 523(a)(2)(A) took place over a span of time of less than three weeks. Chronologically the events are as follows:

a. In August 1990, Grocki opened a line of credit with First Savings & Loan Association of New Hampshire and pledged his residence as collateral. The amount of this line of credit was approximately $24,000.00. Since it was secured by his home, the federal right of rescission period required him to wait three days before drawing on the money. He instructed Judy Provine, his account executive at First Savings to issue a cashier's check for the full proceeds as soon as possible and send the same to his Spartan Money Market Fund.

b. On August 24, 1990, First Savings issued and mailed its cashier's check for $23,796.70 payable to the Spartan Money Market Account.

c. On August 29, 1990 Grocki telephoned Fidelity and talked with Lisa Pearson, who told him that the cashier's check had not yet been received by Fidelity.

d. The business records of Fidelity reflect that on Friday, August 31, 1990 at 11:37 A.M., Ms. Pearson spoke to Grocki by telephone and informed him that the check still had not arrived. She told him to check in the next week and if it had not arrived by then, he should stop payment on the check.

e. Instead of waiting until the next week, Grocki went to First Savings on August 31, 1990, stopped payment on the first

cashier's check and obtained a second cashier's check payable to his "Fidelity USA Account 0020510004383" in the sum of $23,796.70. He mailed this check to Fidelity within a few minutes after obtaining it.

f. On August 31, 1990, the first cashier's check arrived at Fidelity and was deposited and posted to Grocki's Spartan Money Market Account.

g. On August 31, 1990, Fidelity issued its regular monthly USA statement to Grocki. It reflected the USA balance of $7,305.17 and the Spartan Money Market Account balance of $71,884.10. This statement was mailed on Tuesday, September 4, 1990, and it clearly reflected the August 31, 1990 deposit to the Spartan Money Market Account of $23,796.70.

h. On September 5, 1990 the second cashier's check was posted to the USA account.

i. On September 7, 1990 Grocki redeemed the entire balance of his Spartan Money Market Account and transferred the money to the USA account. The total amount transferred was $64,974.79.

j. On September 10, 1990 Grocki issued a $67,000.00 check to cash drawn on the USA account and deposited the funds in his account maintained at the Bank of Boston.

k. On September 11, 1990 Grocki deposited a $23,000.00 check, payable to cash, into his Bank of Boston account. This check was dated September 12, 1990 and his USA account was debited for this amount on September 12, 1990.

■ It is clearly reflected above that Grocki's statements from Fidelity established that his Spartan Money Market Account was opened with $40,000.00 and no additional deposits were made other than interest. Grocki directed Ms. Pearson to forward the $23,796.70 cashier's check payable to the Spartan Money Market Account to Fidelity. Grocki testified he stopped payment on that cashier's check. Yet, on September 7, when he transferred his Spartan Money Market Account to the USA Account, it contained $64,974.79. Although Grocki denies knowing that the cashier's check upon which he had·stopped payment

had, in fact, been deposited to this account, he offered no plausible explanation as to how he could possibly have had that much money in the account without the benefit of the cashier's check. He clearly knew that the difference represented the proceeds from the first cashier's check. The Court simply does not believe Grocki's feeble attempt to justify his actions by his explanation that he was confused as to approximately $10,000.00 of checks that he thought he had written on another account.

■ 11 U.S.C. § 523(a)(2)(A), provides that "a discharge under § 727 ... does not discharge an individual debtor from any debt for money ... to the extent obtained by ... actual fraud...." Actual fraud consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done, or omitted with the design of perpetrating what is known to be a cheat or deception. *In re Michi Nogami*, 118 B.R. 846, 848 (Bankr. M.D.Fl1990); 3 Collier Sec. 523.08(5) (15th Edition 1989).

Plaintiff has the burden of proving actual fraud by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Court is entitled to rely upon circumstantial evidence in order to establish fraudulent intent. *Matter of Van Horne*, 823 F.2d 1285 (8th Cir.1987); *In re Gould* 73 B.R. 225 (Bankr.N.D.N.Y.1987).

■ The use of invalid documents to obtain money constitutes a false representation sufficient to except the resulting debt from discharge. *In re Golden*, 54 B.R. 957 (Bankr., D.Mass.1985). Here, it is clear that Grocki knew that both of the cashier's checks had been deposited to his account. The deposit of the first cashier's check upon which payment had been stopped was the deposit of an invalid document.

The Court is satisfied by the preponderance of the evidence that Grocki knew he was withdrawing far more money from the account than was his, and his failure to mention this fact to Fidelity was an omission which amounts to actual fraud.

■ Having determined that Grocki is guilty of fraud, this debt will not be subject to discharge. Next, we turn our attention to the second aspect of this case—the tracing of the funds directly to Grocki's homestead in Florida. A chronological listing of his transfers is as follows:

a. Grocki closed his Bank of Boston account on October 2, 1990 and transferred all of the funds therein to an account at Prudential Bache, so as to have immediate availability of funds in Florida.

b. On November 13, 1990, Grocki signed a contract to purchase his present homestead for $130,000.00.

c. The closing on the contract to purchase took place a mere eight days after the signing of the contract.

d. Grocki's cash to close, $30,000.00, was transferred from the Prudential Bache account by wire transfer. The balance of the cash to close was a $104,000.00 thirty year mortgage in favor of California Federal.

e. On December 31, 1990, Grocki withdrew $80,000.00 from the Prudential Bache account and purchased a $75,000.00 Certificate of Deposit at Barnett Bank. Grocki left a minimal balance in the Prudential Bache account.

f. On February 28, 1991 the Certificate of Deposit including all accrued interest, $75,331.19, was used to reduce the principal balance of the California Federal Mortgage.

g. March 8, 1991, Grocki, having obtained all of his remaining cash from all sources paid an additional $29,896.71 and satisfied the California Federal Mortgage in full. This payment was a cash payment directly to the bank.

Grocki testified he paid off the mortgage on his homestead because he had been sued by the guardian of a one year old girl alleging the girl suffered from lead paint poisoning from one of Grocki's rental houses. He was afraid a judgment might be obtained even though he maintained innocence in the matter. He knew his homestead would be exempt from execution and sale and wanted to transfer his cash assets to the homestead.

It is clear from the above tracing of funds that Defendant's ill gotten money obtained from Plaintiff was used to satisfy the mortgage indebtedness on Defendant's homestead.

Florida has a long history of granting protection to homestead property. However, Florida courts have repeatedly recognized the proposition that the homestead exemption laws should not be applied so as to make them an instrument of fraud, or an imposition on creditors, nor as a means to escape honest debts. *Gepfrich v. Gepfrich*, 582 So.2d 743 (Fla. 4th DCA 1991); *Anderson v. Anderson*, 44 So.2d 652 (Fla. 1950); *Jetton Lumber Co. v. Hall*, 64 So. 440 (Fla. 1914); *Hillsborough Inv. Co. v. Wilcox*, 152 Fla. 889, 13 So.2d 448 (1943); *Vandiver v. Vincent*, 139 So.2d 704 (Fla. 2d DCA 1962); *Frase v. Branch*, 362 So.2d 317 (Fla. 2d DCA 1978); *Heritage Insurance Co. v. Foster Electric Co.*, 393 So.2d 28 (Fla. 3rd DCA 1981).

■ Where fraud or irreprehensible conduct is involved, an equitable lien may be imposed even against homestead property. *Gepfrich v. Gepfrich*, supra; *Clutter Construction Corp. v. Clutter*, 173 So.2d 761 (Fla. 3rd DCA 1965); *Isaacson v. Isaacson*, 504 So.2d 1309 (Fla. 1st DCA 1987); *Bessemer v. Gersten*, 381 So.2d 1344 (Fla. 1980).

■ The purpose of an equitable lien is to achieve right and justice, considering the relations of the parties and the circumstances of their dealings. When an equitable lien is sought against homestead real property, some fraudulent or otherwise egregious act by the beneficiary of the homestead protection must be proven. *Isaacson v. Isaacson*, supra. Defendant's fraud is egregious conduct.

This Court has the inherent power pursuant to 11 U.S.C. § 105 to grant Plaintiff an equitable lien on Defendant's homestead and will do so.

WHEREFORE, IT IS ORDERED AND ADJUDGED by the Court as follows:

1. Defendant's debt to Plaintiff in the amount of $23,796.70 plus interest is non-dischargeable pursuant to 11 U.S.C. 523(a)(2)(A).

2. Plaintiff is entitled to an equitable lien against Defendant's homestead real property legally described as:

Unit 704, Building 2 or Porta Bella East Condominium a Condominium according to the Declaration thereof as recorded in O.R. Book 2512, Page 1092 of the Public Records of Palm Beach County, Florida.

3. Plaintiff may execute and levy against the aforementioned property and the provisions of Article X, Section 4 of the Florida Constitution shall not be a defense against such execution and levy.

United States Bankruptcy Court,
M.D. Georgia,
Athens Division.