**In re: Ernest C. COX and Charlene Cox, Debtors.**

**CITIBANK F.S.B. (FLORIDA), Plaintiff,**

**v.**

**Ernest C. COX and Charlene Cox, Defendants.**

**Bankruptcy No. 92–04082.**
**Adv. No. 92–8029.**

United States Bankruptcy Court,
N.D. Florida,
Pensacola Division.

Dec. 23, 1992.

Sally Bussell, Pensacola, FL, for plaintiff.

Daniel Perri, Shalimar, FL, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS CAUSE came before the Court upon Plaintiff's, Citibank F.S.B. (Florida) ("Citibank"), Complaint seeking a determination of the dischargeability of credit card debt. Citibank asserts the debtors misrepresented their intention and ability to repay a debt incurred almost a year before the filing of their bankruptcy petition, and, therefore, the debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). For the following reasons, the Court finds Citibank has failed to demonstrate the debtors' fraudulent intent by a preponderance of the evidence, and therefore, enters judgment in favor of the debtors.

## FINDINGS OF FACT

The debtors are a married couple who were initially solicited by Citibank through a "Pre–Approved Ready Credit" direct

mailing.[1] The "Acceptance Certificate" was submitted to Citibank on November 13, 1990, and indicated that both parties were employed with a combined monthly income of $3,000. On December 10, 1990, Citibank opened a line of credit in the debtors name and provided them with "checks" with which to access the line of credit.[2] The debtors did not draw against the line of credit until February 1991, when the following activity took place:

| Date | Check # | Amount |
|------|---------|--------|
| 2/13/91 | 101 | $3,000.00 |
| 2/14/91 | 102 | 400.00 |
| 2/14/91 | 105 | 650.00 |
| 2/14/91 | 103 | 835.00 |
| 2/15/91 | 107 | 500.00 |
| 2/19/91 | 106 | 6.50 |
| 2/19/91 | 104 | 75.00 |
| 2/21/91 | 108 | 300.00 |
| | | $5,766.50 |

The proceeds from check # 101 were applied to bring the debtors' mortgage current and to pay several late bills. Checks # 102 and # 105 went to pay off debts owed to friends arising from the purchases of bedroom furniture. Check # 103 paid off a debt to Babcock Furniture arising from the purchase of living room furniture prior to the couple's marriage in August 1990. No credible explanation was given for the use of the balance of monies drawn on the Citibank facility. The debtors made a $140 payment on the Citibank obligation on March 19, 1991. No other payments were made on the debt. A copy of a monthly statement reflects the credit facility was "suspended" sometime between April 23 and May 23, 1991.

In March 1991, a Florida domestic relations court increased the husband's child support from $150 to $350 per month. The wife's employment, which had become part-time in August 1990, ceased entirely in January 1991. In addition, wife's child support payments had become sporadic by early 1991. After "juggling" bills for several months, the couple first sought bankruptcy advice in November or December 1991, and filed a petition for relief on January 27, 1992.

In a one count complaint, Citibank asserts in general terms that the debtors made false representations in their application, and that in quickly drawing line of credit to just under their credit limit to repay other debts incurred from consumer purchases, the debtors have obtained credit by false pretenses, false representations, or actual fraud, and therefore, the debt is non-dischargeable pursuant to § 523(a)(2)(A). The debtors deny they made any false representations and "claim" that they fully intended to repay Citibank at the time they incurred the debt.

## CONCLUSIONS OF LAW

A tension in the application of § 523 exceptions to discharge-ability is created by two important, but sometimes conflicting policy considerations. On one hand, the fundamental importance of discharge and fresh start in the bankruptcy process dictates that exceptions to dischargeability be strictly or narrowly construed. *Schweig v. Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986). On the other hand, because courts loathe rewarding a debtor who attempts to take advantage of the bankruptcy process to avoid the consequences of his misdeeds, only the honest, but unfortunate debtor is generally afforded relief from his obligations. *Transouth Financial Corp. v. Johnson*, 931 F.2d

---

**1.** The initial direct mailing indicated that the Debtors were "pre-approved" for a $6,000 line of credit even though no information had been provided Citibank by the Debtors. Testimony from a Citibank employee revealed that the Debtors were selected for a solicitation from information provided by an independent credit reporting service which identified the Debtors as having a household income over $25,000 per year.

**2.** Other than a review of a credit report which verified the husband's employment with the Air Force and Citibank's return of the initial solicitation form to the Debtors to fill in a social security number and place of employment, there was no evidence of any effort of the bank to ascertain or verify any information concerning the Debtors' creditworthiness. The "pre-approved" application did not ask for any information beyond the applicant's name, address, social security number, place of employment, date of birth, and household income.

1505, 1508 (11th Cir.1991) (Citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). The conflict of serving these two masters is apparent in the varying analytical approaches taken by courts when addressing the fraudulent use of consumer credit facilities.

Section 523(a)(2)(A) excepts from discharge those debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition". In order to except a debt from discharge due to the debtor's under this subsection, a creditor must prove that:

1) The debtor made a false representation with the purpose and intent of deceiving the creditor;

2) The creditor actually relied on the representation;

3) Such reliance by the creditor was reasonably founded; and

4) The creditor sustained a loss as a result of the representation.

*Hunter*, 780 F.2d at 1579. In general, any such representation must be overt; failure to make full disclosure is not sufficient to except a debt from discharge. *Hunter*, 780 F.2d at 1580; *Davison–Paxon Co. v. Caldwell*, 115 F.2d 189, 191 (5th Cir.1940). Thus, a debtor generally need not reveal his insolvency to a potential creditor to avoid the risk that the debt may be held non-dischargeable in a subsequent bankruptcy proceeding. *Id.*

The perceived difficulty in applying the false misrepresentation standards in those cases where the debt in question arose from credit card use lead some courts to find an implied representation of willingness and ability to pay by the debtor. *See,*

*Manufacturer's Hanover Trust Co. v. Ward*, 857 F.2d 1082 (6th Cir.1988). *See also, In re Dougherty*, 84 B.R. 653, 656 (9th Cir.B.A.P.1988) (explaining that the elements of representation and reliance are so difficult to prove as to be rendered meaningless). This line of authority holds that when a credit card holder uses it with the knowledge of his inability and lack of intent to repay, he has obtained property through false pretenses. *Montgomery Ward & Co. v. LaBuda*, 37 B.R. 47, 48 (Bankr.M.D.Fla.1984). The analytical approach of these courts maintains the essential elements of fraudulent misrepresentation which, in effect, requires creditors engage in minimal investigation and verification of information to ferret out uncreditworthy customers. *Ward*, 857 F.2d at 1084; *Hunter*, 780 F.2d at 1580.

The Eleventh Circuit somewhat refined the implied representation approach by stating an issuer assumes the risk of loss stemming from the use of a credit card until it provides the holder clear and unequivocal notice of revocation of the right of possession and use of the card. *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir.1983).[3] *Roddenberry* held that any knowing use or possession of a credit card by a debtor after receipt of the issuer's clear revocation was more than mere concealment, but an affirmative representation sufficient to warrant excepting the debt from discharge. *Id.*[4] Implicit within the *Roddenberry* decision was the notion that a credit card issuer must take reasonable steps to protect itself from abuse of the cards by its customers. *In re Nogami*, 118 B.R. 846, 852 (Bankr.M.D.Fla.1990).

---

**3.** The *Roddenberry* court was persuaded that the relatively high rates of interest of these types of credit facilities somehow enticed banks to accept higher rates of non-payment and non-compliance with loan terms. *Roddenberry*, 701 F.2d at 932 ("Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed credit limits."). *Roddenberry* fails, however, to distinguish the risk-taking of credit

card issuers from any other type of creditor. Indeed, all creditors extend terms which reflect the risk of non-payment as well as the supply and demand for credit services in general.

**4.** *Roddenberry* left open the issue of whether pre-revocation debts are dischargeable. *Roddenberry*, 701 F.2d at 928. Moreover, *Roddenberry* reserved comment of whether the addition of "actual fraud" in the passage of § 523 of the Code would eliminate any distinction between active misrepresentation and concealment.

Still other Courts have found both the "implied representation" and "assumption of risk" analytical approaches unsatisfying when presented with a debtor who has taken advantage of the ease of credit card use just before the filing of a bankruptcy petition. These courts find the implied representation approach too often allows creditors to translate the financial difficulty of the debtor into an intent to defraud. *See, e.g., Sears, Roebuck and Co. v. Faulk,* 69 B.R. 743, 753 (Bankr.N.D.Ind.1986).[5] The assumption of risk approach is also disfavored because it seemed to permit too many holders who knowingly abuse credit cards prior to and in anticipation of filing for bankruptcy relief to avoid the consequences of their actions. *See, e.g., Dougherty,* 84 B.R. at 656, 657.

These courts instead draw upon the inclusion of "actual fraud" in § 523(a)(2)(A) to preclude the discharge of credit card charges incurred without the present intention to repay. *See, e.g., Chevy Chase F.S.B. v. Cacho,* 137 B.R. 864, 866 (Bankr.N.D.Fla.1991).[6] The use of actual fraud to except certain credit card charges from discharge focuses solely upon the debtor's intent at the time the charge was incurred and, thereby, eliminates the necessity of proving the misrepresentation and reasonable reliance elements required in other § 523(a)(2)(A) situations. *Id.*[7] The requisite intent may be inferred from the actions of the debtor in light of the surrounding circumstances. *In re Faulk,* 69 B.R. 743, 754 (Bankr.N.D.Ind.1986).

Upon earlier consideration of the issue, this Court identified a number of factors from which a court may consider in determining the debtor's intent while using a credit. These factors are:

1) The length of time between the charges and the filing of the bankruptcy;

2) Whether an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3) The number of charges;

4) The amount of the charges;

5) The financial condition of the debtor when the charges were made;

6) Whether the charges exceeded the credit limit of the account;

7) Whether there were multiple charges on the same day;

8) Whether the debtor was employed;

9) The debtor's prospects for employment;

10) The financial sophistication of the debtor;

11) Whether the debtor's spending habits suddenly changed; and

5. These cases were largely decided using a clear and convincing standard of proof. The Supreme Court in *Grogan v. Garner* held that the appropriate standard of proof in § 523 exception to discharge proceedings in the ordinary preponderance of the evidence. 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Whether these courts would have held that an implied representation was contrary to the Code's intent under this lower standard of proof is questionable.

6. Actual fraud is defined as any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. 3 Collier on Bankruptcy ¶ 523.08[5] (15th Ed. 1992).

7. Excepting of credit card charges from discharge on the basis of actual fraud without a showing of misrepresentation or reasonable reliance appears to be gaining acceptance despite a lack of specific statutory language or evidence that Congress intended credit card issuers were

to be given special treatment. *Faulk,* 69 B.R. at 752. Indeed some courts have retained these elements when analyzing actual fraud in credit card cases. *Chase Manhattan Bank v. Carpenter,* 53 B.R. 724, 729 (Bankr.N.D.Ga.1985) (holding that plaintiff had the burden of proving each of five elements, including misrepresentation and reasonable reliance, to sustain exception to discharge); *In re Nogami,* 118 B.R. 846 (Bankr. M.D.Fla.1990) (credit card issuer needs to show that it took all reasonable steps to detect and prevent card user's actual fraud); *In re Boebel,* 79 B.R. 381 (Bankr.N.D.Ill.1987); *In re Maranzino,* 67 B.R. 394 (Bankr.D.Kan.1986); *Morin v. McIntyre,* 64 B.R. 27 (Bankr.D.N.H.1986); *In re Simpson,* 29 B.R. 202 (Bankr.N.D.Iowa 1983). However, § 523(a)(2)(C) presumptively characterizes certain debtor behavior with open ended consumer credit facilities as non-dischargeable under § 523(a)(2)(A). It may be inferred from this subsection that Congress intended other debts similarly incurred to excepted under § 523(a)(2)(A) when circumstances so warrant.

12) Whether the charges were incurred for luxuries or necessities.

*Cacho,* 137 B.R. at 866.

A particularly thorny problem is raised by the instant case in that the debtor did not incur the debts through the use of a credit card. Citibank extended an open-ended credit facility that was accessed through bank drafts written by the debtors. The accepting vendor or bank was not presented a plastic card for payment or cash, but rather, a check drawn on a Citibank account. Upon presentment for payment, Citibank simply drew against a line of credit instead of funds deposited into a demand account. A vendor is not required to run a standard credit check for purchases in excess of $50, nor is he entitled to rely on the card issuer's promise to pay on behalf of the purchaser. In short, the credit facility operated like a regular checking account with an over-line protection agreement.[8] A question whether the § 523(a)(2)(A) actual fraud dischargeability analysis applies to non-credit card consumer debts arises in this case.

■ Fortunately the Court need not decide today whether the traditional elements of representation and reasonable reliance are applicable to this type of consumer obligation. The issue may be disposed on Citibank's failure to prove by a preponderance of the evidence an essential element common to all § 523(a)(2)(A) analytical schemes: the debtor's intent to defraud. Evidence adduced at trial indicated that the debtors largely used the Citibank facility to repay other debts incurred by the purchase of household furnishings and to cure an arrearage on the couple's residence. Despite the debtors' nearly running the balance of Citibank facility up to their credit limit within a nine day time frame in February 1991, there was no evidence that they used the line of credit to fund the purchase of luxuries or an increase in overall household spending. Moreover, the debtors did not consult with a bankruptcy attorney about filing a petition until some ten months after the debt had been incurred. The petition in bankruptcy was filed almost eleven and a half (11½) months after the debt was incurred. In the interim, the debtors continued to attempt to make ends meet and to pay what they could to creditors. In short, the record simply supports a finding that the debtors were struggling to cope with their bills as they came due until certain events necessitated bankruptcy relief. Financial hardship alone is insufficient to support a conclusion that the debtor intended to defraud creditors. Accordingly, it is

ORDERED Citibank's Complaint seeking a determination that its debt with the debtors is non-dischargeable be, and hereby is dismissed. · A Final Judgment consistent with the findings of fact and conclusions of law contained herein will be separately entered.

DONE AND ORDERED.

---

**8.** The Court is unable to locate any case authority which extends the actual fraud analysis to any consumer debt application other than credit cards. There is ample authority to support the traditional five element standard of fraudulent misrepresentation to NSF checks. A few cases have applied this same standard to situations wherein the debtor has drawn upon credit arrangements through the use of checks, *In re Nahas,* 92 B.R. 726 (Bankr.E.D.Mich.1988), or sight drafts *In re Begun,* 136 B.R. 490 (Bankr. S.D.Ohio 1992).