**In the Matter of Abigail L. McKINNON, Debtor.**

**AMERICAN EXPRESS TRAVEL RE-LATED SERVICES COMPANY, INC., Plaintiff,**

v.

**Abigail L. McKINNON, Defendant.**

**Bankruptcy No. 94–82809.**
**Adversary No. 95–80045.**

United States Bankruptcy Court,
N.D. Alabama,
Northern Division.

Feb. 29, 1996.

*ways (Rushton v. Saratoga Forest Prod., Inc.),* 177 B.R. 960 (D.Utah 1995), *rev'g.,* 172 B.R. 99 (Bankr.D. Utah 1994).

Joseph E. Bulgarella, Key, Frawley, Bulgarella & Key, Birmingham, AL, for plaintiff.

William Gibbons, Huntsville, AL, for defendant.

## MEMORANDUM OPINION

JACK CADDELL, Bankruptcy Judge.

This matter is before the Court on a motion of the defendant/debtor, Abigail McKinnon (hereinafter "McKinnon"), for reconsideration of this Court's order denying the discharge of certain obligations incurred by McKinnon and owed to American Express Travel Related Services Company, Inc. (hereinafter "American Express"), pursuant to 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code (the "Code"). The hearing in this matter was held on the 30th day of January, 1996. This is a core proceeding under 28 U.S.C. § 157(a), (b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1). The Court has considered the motion, the response of American Express, the documents submitted in support thereof, and finds and concludes as follows.[1]

## FINDINGS OF FACT

On August 11, 1995, the Court entered an order awarding American Express $37,552.96 plus attorneys' fees, and denying the discharge of McKinnon's credit card obligations pursuant to section 532(a)(2)(A) of the Code.[2] The debtor now seeks to alter or amend this Court's order denying the discharge of certain obligations owed to American Express, and in support thereof argues that American Express wholly failed to satisfy its burden of proof under section 523(a)(2)(A) of the Code.

On December 15, 1994, McKinnon filed a voluntary petition for relief under Chapter 7 of the Code. American Express filed this adversary proceeding objecting to the discharge of the following American Express charge accounts listed in McKinnon's Chapter 7 petition: (1) Account # 3713–896116–81006 (Account # 1); and (2) Account # 3720–561035–52008 (Account # 2). Each account was opened late in 1981. As of the filing date of McKinnon's petition, the balance of Account # 1 was $23,155.50, while the balance of Account # 2 was $16,987.00.

According to McKinnon's testimony, during 1994 her monthly take home pay was $2,374.00 while her monthly expenses were $2,494.00 for an approximate monthly deficit of $120.00. McKinnon remains in the same financial predicament although employed as an assistant principal with the Jefferson County Board of Education. McKinnon testified that she has a master's degree in education, and that she would receive her doctorate in education within one week after the trial.

During a two month period between May 20, 1994 and July 30, 1994, McKinnon incurred $20,587.91 in charges on Account # 1 with 44 transactions. Prior to incurring said obligation, the highest account balance on Account # 1 was $12,625.47. McKinnon also incurred $13,826.31 on Account # 2 between March 29, 1994 and June 15, 1994 in 43 separate transactions. Previously, the highest balance on Account # 2 was $8,597.97. American Express never established a credit limit for either account. Both account contracts require full payment of charges at the end of each billing cycle; however, McKin-

---

**1.** The following Memorandum Opinion constitutes Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

**2.** The Court entered an amended order, dated September 27, 1995, increasing the attorneys' fees originally awarded from $2,593.00 to $5,052.69.

non has not made any payments on either account since June of 1994.

A substantial majority of the charges were incurred by or with McKinnon's permission after she entered into a business agreement with Graphic Partners of America (hereinafter "GPA") and L.K. Corporation (hereinafter "LKC") in which McKinnon agreed to finance a book on the history of the Russian space program. GPA is a corporation located in Huntsville, Alabama, while LKC is a corporation located in and operating under the laws of Russia.

LKC, the owner of all the rights to the Russian space flight book, agreed to share the profits from the book with GPA in exchange for GPA's agreement to be responsible for undertaking the production, printing, and advertising obligations associated with the book and to finance said obligations. To formalize their agreement LKC and GPA entered into a contract, dated December 22, 1993, under which the proceeds were to be distributed by first paying GPA for all actual expenses incurred in the production, printing, advertising, and distribution of the book with the profits to be divided equally between LKC and GPA.

In December of 1993, Alexei Losev, the president of LKC, approached McKinnon with a business proposition regarding the publication of the book. Losev and his wife, Anna, personal acquaintances of McKinnon, visited McKinnon during Losev's business trip to Huntsville during which he negotiated the book deal with GPA. It was during this visit that Losev proposed a separate business arrangement with McKinnon under which she agreed to undertake GPA's obligation to finance the production, printing, advertising, and distribution expenses.

Losev clarified McKinnon's obligations and rights under their agreement in a letter dated January, 11, 1994. In exchange for her agreement to finance the book, GPA was to reimburse McKinnon for the expenses that she covered and LKC was to divide its one-half interest in the profits with McKinnon. Losev explained in the letter that LKC's anticipated share of the profits was approximately $100,000.00 of which McKinnon would be entitled to $50,000.00.

McKinnon testified that it was her understanding that the anticipated total expenses were expected to be $50,000.00. According to McKinnon, it was understood by all of the parties that McKinnon intended to use her American Express card to finance these expenses.

According to McKinnon, she provided LKC and GPA with her American Express account numbers, and authorized them to make numerous charges to said accounts to satisfy her obligation under the agreement. Apparently, GPA would contact McKinnon and request authorization to use the account numbers to make various charges. A substantial portion of the charges incurred during the production and promotion of the book by GPA and LKC represented food, beverages and hotel lodging expenses in various American cities, as well as Moscow, Russia.

At the hearing, McKinnon admitted that independent of her agreement with LKC and GPA she did not have the ability to cover all of the expenses charged to finance the book. However, McKinnon further testified that at the time that she authorized all of the charges she wholly believed that she would be able to cover the expenses from the income received after the publication of the book.

McKinnon testified that although the book was an excellent product, GPA did not engage in an effective marketing campaign promoting the Russian space book. Apparently, this was GPA's first attempt at publishing and marketing a book. McKinnon testified that GPA abandoned the book after discovering that it was running over budget.

## CONCLUSIONS OF LAW

Based upon the foregoing, McKinnon argues that American Express is not entitled to a determination of non-dischargeability under 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) of the Code prohibits the discharge of an individual from any debt—

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement

respecting the debtor's or an insider's financial condition.

 Subject to certain exceptions expressly enumerated in the Code, the purpose of the Code is to provide honest but financially distressed debtors with a fresh start. *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir.1993); *Chase Manhattan Bank v. Ford (In re Ford)*, 186 B.R. 312, 316 (Bankr.N.D.Ga.1995); *Household Credit Servs., Inc. v. Peterson (In re Peterson)*, 182 B.R. 877, 879 (Bankr.N.D.Okla. 1995); *Citibank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (Bankr. 9th Cir. BAP 1988). It is well established that exceptions to discharge are to be construed narrowly against creditors, and must not be allowed to swallow the general rule favoring discharge. *Mercantile Bank v. Williamson (In re Williamson)*, 181 B.R. 403 (Bankr.W.D.Mo.1995); *American Express Travel Related Servs., Inc. v. Nahas (In re Nahas)*, 181 B.R. 930 (Bankr.S.D.Ind.1994); *Citibank v. Cox (In re Cox)*, 150 B.R. 807 (Bankr.S.D.Fla.1992).

 Section 523(a)(2)(A) is based upon the following traditional elements of common law fraud: (i) false representation; (ii) intent to deceive; (iii) reliance; and (iv) damages. Thus, to prevail on the question of dischargeability under section 523(a)(2)(A), the creditor must prove that:

(1) the debtor made a representation;

(2) the debtor knew the representation to be false when made;

(3) the debtor made the false representation with the purpose and intention of deceiving the creditor; and

(4) the creditor sustained a loss as a result of the representation.

*In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986); *In re Williamson*, 181 B.R. at 403. Further, the creditor must demonstrate to the court that its reliance upon the debtor's false representation was justifiable. *Field v.*

*Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277 (11th Cir.1995).[3]

 The creditor has the burden of proving each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). A lack of proof as to any one of the stated elements will be fatal to the party's claim of fraud. *Hunter*, 780 F.2d at 1579.

The application of section 523(a)(2)(A) to credit card debts presents a particularly difficult question for bankruptcy courts due to the nature of the underlying credit transaction. The problem is that in a typical credit card transaction there is no interaction between the debtor and the credit card company. " 'Consequently, the cardholder cannot be said to have directly represented anything to the issuing bank [and] the bank has nothing upon which to base an act of reliance.' " *American Express Travel Related Servs., Inc. v. Murphy (In re Murphy)*, 190 B.R. 327, 330 (Bankr.N.D.Ill.1995) (citing *Matter of Ford*, 186 B.R. 312, 317 (Bankr.N.D.Ga. 1995).

A plethora of theories with variant tangents have emerged in an attempt to alleviate this dilemma associated with the representation element of actual fraud. In determining the issue of whether credit card debt is dischargeable, the majority of courts have adopted the "implied representation" theory under which the first element of representation is found by implication. Under the most common tangent of the implied representation theory a cardholder impliedly represents to the creditor that he has the intent *and* ability to pay for the goods and services charged merely by using the credit card. *Citicorp Credit Servs. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1021 (Bankr.D.N.D.1990) (providing that the "mere use of a bank card"

---

**3.** In the case of *In re Vann*, the Eleventh Circuit addressed the question of what standard of reliance a creditor must satisfy under section 523(a)(2)(A) to be entitled to a determination of non-dischargeability. The court turned to the common law to determine the applicable standard because the statute did not indicate the type of reliance required to prevent discharge. After discussing the distinctions between reasonable and justifiable reliance, the court chose to adopt the justifiable reliance standard for the Eleventh Circuit under which a creditor's reliance is gauged by an individual standard of the creditor's own capacity and knowledge.

establishes the element of representation); *see also Sears Roebuck & Co. v. Naimo (In re Naimo)*, 1995 WL 163598 (Bankr. E.D.Pa.1995); *Signet Bank v. Rawoot (In re Rawoot)*, 14 F.3d 596 (4th Cir.1993); *In re Faulk*, 69 B.R. 743 (Bankr.N.D.Ind. 1986).

Under a second version of the implied representation theory, the cardholder impliedly represents to the creditor only that he has the intent to pay for each charge. *See Household Card Servs./Visa v. Vermillion (In re Vermillion)*, 136 B.R. 225 (Bankr. W.D.Mo.1992) (citing *Chase Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724 (Bankr.N.D.Ga.1985); *Montgomery Ward & Co. v. Blackburn (In re Blackburn)*, 68 B.R. 870 (Bankr.N.D.Ind.1987); *Sears & Roebuck Co. v. Faulk (In re Faulk)*, 69 B.R. 743 (Bankr.N.D.Ind.1986)). Courts adopting this theory provide that finding implied representation of an ability to pay constitutes implied fraud which is not permitted under section 523(a)(2)(A) of the Code. *In re Vermillion*, 136 B.R. at 226. The court in *In re Vermillion* rejected this tangent of the implied representation theory by finding that an implied representation of ability to pay does not constitute implied fraud because the creditor is still required to prove that the debtor had an intent to deceive to be entitled to an award of non-dischargeability under section 523(a)(2)(A). *Id.*

Another theory used to find the representation element is commonly referred to as the "assumption of the risk" theory. The case most commonly cited for this theory is the Eleventh Circuit case of *First Nat'l Bank v. Roddenberry*, 701 F.2d 927 (11th Cir.1983). The assumption of the risk theory provides that a cardholder makes a false representation to the issuer only when revocation of the card is communicated to the cardholder and, thereafter, the cardholder continues to use the card. Thus, only post-revocation charges may be deemed non-dischargeable under the assumption of the risk theory. *In re Dougherty*, 84 B.R. at 656. The *Roddenberry* Court explained as follows:

> [W]e hold that the voluntary assumption of the risk on the part of a bank continues until it is clearly shown that the bank

unequivocally and unconditionally revoked the right of the cardholder to further possession and use of the card, and until the cardholder is aware of this revocation. A card issuer, acting upon its own judgment, may elect to continue to extend credit; it shall be presumed to do so until clear revocation has taken place. Only after such clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representations" within the meaning of section 17a(2)'s exemption from discharge.

*In re Roddenberry*, 701 F.2d at 932.

Several courts have rejected this theory because it places the focus upon the conduct of the "improvident creditor" rather than the debtor. *In re Dougherty*, 84 B.R. at 657; *see also Hecht's v. Valdes (In re Valdes)*, 188 B.R. 533 (Bankr.D.Md.1995); *Norwest Bank v. Orndorff (In re Orndorff)*, 162 B.R. 886 (Bankr.N.D.Okla.1994); *Bank One v. McDonald (In re McDonald)*, 177 B.R. 212 (Bankr.E.D.Pa.1994); *Household Card Servs. v. Vermillion (In re Vermillion)*, 136 B.R. 225 (Bankr.W.D.Mo.1992); *Citibank v. Cox (In re Cox)*, 150 B.R. 807 (Bankr.N.D.Fla. 1992).

Other courts that are bound by the Eleventh Circuit decision have attempted to distinguish *Roddenberry* wherein the case was decided under section 17(a)(2) of the Bankruptcy Act of 1898 under which actual fraud was not an element. *In re Carpenter*, 53 B.R. at 724. Specifically, the Bankruptcy Act of 1898 excepted from discharge debt for money obtained by false pretenses or false representation. *Id.* The court in *Carpenter* recognized that the *Roddenberry* decision has been highly criticized, but, nevertheless found that it was bound by the dictates of the Eleventh Circuit decision. However, the court distinguished *Roddenberry* by holding that "actual fraud, with which the court in *Roddenberry* did not deal, will prevent a [pre-revocation] debt from being discharged." *Id.* at 729.

Although the court declined to adopt the implied representation theory in light of *Roddenberry*, it nevertheless found the element of representation by implication. *Id.* at 730.

The court stated that "when one uses a charge card, one is representing that he has the present intention to pay for the charge incurred." *Id.* at 730. The court then considered a list of twelve objective factors to determine whether the debtor made the false representation with intent to deceive pursuant to section 523(a)(2)(A). *Id.*

Another court in the recent case of *Chase Manhattan Bank v. Ford,* 186 B.R. 312 (Bankr.N.D.Ga.1995), interpreted the term actual fraud in a manner purporting to comply with the dictates set forth in *Roddenberry.* The court explained as follows:

> [T]his Court finds that it must interpret the term "actual fraud" in accordance with the general policies and guidelines which this Circuit has endorsed in cases such as Davison–Paxon and Roddenberry. See *Birmingham Trust Nat'l Bank v. Case,* 755 F.2d 1474, 1476 (11th Cir.1985) (case law construing Bankruptcy Act section 17(a) should serve as guide for interpreting Code section 523(a)(2)(A)); *Carpenter,* 53 B.R. at 728. Specifically, this Court must define the term "actual fraud" so as to narrowly construe discharge exceptions and to avoid certain creditors getting special protection in bankruptcy for the assumption of common business risks. *Roddenberry,* 701 F.2d at 931.

*Id.* at 320. To effectuate this mandate, the court expressly adopted a third theory known as the totality of the circumstances theory, also referred to as the objective test theory. *Id.* (providing that "courts should determine the existence of ... misrepresented intent by looking to the totality of the circumstances").

The totality of the circumstances theory requires the creditor to prove that the debts were incurred with no intention of paying them, with the intent to be drawn from the circumstances. *See American Express Centurion Bank v. O'Brien (In re O'Brien),* 176 B.R. 640 (Bankr.S.D.Fla.1995); *Bank One v. McDonald (In re McDonald),* 177 B.R. 212 (Bankr.E.D.Pa.1994); *Mercantile Bank v. Troutman,* 170 B.R. 156 (Bankr.D.Neb.1994). Most courts that adopt the totality of the circumstances theory employ a list of factors which are to be considered to determine

whether the debtor had an intent to deceive. *See In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988). Thus, in essence, the totality of the circumstances theory adopts the "reasonable man" test or an objective test to determine whether the debtor had the requisite intent to commit actual fraud.

The totality of the circumstances theory is "similar to the assumption of the risk theory in that any charges made after the issuer communicates the revocation of the card privileges will be rendered nondischargeable" while pre-revocation charges may be deemed non-dischargeable if the creditor is able to prove that the debtor committed actual fraud. *Hecht's v. Valdes (In re Valdes),* 188 B.R. 533, 536 (Bankr.D.Md.1995).

The case of *In re Williamson,* 181 B.R. 403 (Bankr.W.D.Mo.1995), provides an excellent discussion of the totality of the circumstances theory. The *Williamson* court enumerated twelve non-exclusive factors to be considered when determining if the debtor committed actual fraud with regard to pre-revocation charges:

1) The length of time between the charges made and the filing of the bankruptcy;

2) Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3) The number of charges made;

4) The amount of the charges;

5) The financial condition of the debtor at the time the charges are made;

6) Whether the charges were above the credit limit of the account;

7) Whether the debtor made multiple charges on the same day;

8) Whether or not the debtor was employed;

9) The debtor's prospects for employment;

10) Financial sophistication of the debtor;

11) Whether there was a sudden change in the debtor's buying habits; and

12) Whether the purchases were made for luxuries or necessities.

In *Williamson,* the court found, after considering the above factors, that the credit card debt in question was dischargeable. The dischargeability complaint against the debtor alleged some $3,000.00 worth of credit card debt should be non-dischargeable. The court found, however, that in the four months prior to the filing of the bankruptcy petition that the debtor had only incurred four charges for a total of $106.17, and that the debtor had made two payments in that four month period, one for $250.00 and one in the amount of $500.00. The court further found that the debtor had not made any charges after he had consulted a bankruptcy attorney. Also, the court found that with the exception of four cash advances, all the charges were typical of the debtor's credit card use in years past. The court further found that although some of the charges were made while the debtor was unemployed that, nonetheless, the debtor thought that he had secured employment in Florida. Finally, based on the totality of the circumstances and applying the factors, the court found the debt to be non-dischargeable.

The case of *In re Hoyle,* 183 B.R. 635 (Bankr.D.Kan.1995) also presents an excellent discussion of the totality of the circumstances theory. In that particular case, the debtor was paying off his credit card debts by using cash advances from other credit cards. The debtor had an annual income of only $15,000.00, but he had over $40,000.00 worth of credit card debt when he applied for the most recent credit card. Further, the debtor had omitted information on different loan applications demonstrating that he knew of his precarious financial condition. Thus, the debt was excepted from discharge.

A fourth theory for determining the dischargeability of credit card debt under section 523(a)(2)(A) was announced in the case of *Chase Manhattan Bank v. Murphy (In re Murphy),* 190 B.R. 327 (Bankr.N.D.Ill.1995). This theory may be referred to as the common law test or the subjective test. In *Murphy,* the Court turned to the common law of frauds to determine whether credit card advances incurred by a gambler were nondischargeable pursuant to section 523(a)(2)(A) where the evidence established that the debtor knew that he could never repay the indebtedness solely from his income as a self-employed realtor. After discussing the various competing credit card fraud theories, the Court predicated its decision awarding judgment in favor of the debtor upon the common law of fraud. The Court based its decision upon the recent Supreme Court case of *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), in which the Supreme Court instructed courts to "apply common law principles to dischargeability issues." *See In re Murphy,* 190 B.R. at 331 n. 6.

In *Field,* the Supreme Court, while determining the applicable standard of reliance required under section 523(a)(2)(A), stated that "where Congress uses terms that have accumulated settled meaning under … the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Field v. Mans,* —— U.S. at ——, 116 S.Ct. at 443. Accordingly, *Field* mandates the use of common law principles in the application of section 523(a)(2)(A) because Congress did not define the concepts of "false pretenses", "false representation", and "actual fraud" when it adopted section 523(a)(2)(A) in the 1978 Bankruptcy Code. *See In re Murphy,* 190 B.R. at 331. In determining the common law elements of fraud, the *Field* Court referred to and relied upon the Restatement (Second) of Torts which was in effect when the Bankruptcy Code was updated. *Field,* —— U.S. at ——, 116 S.Ct. at 442.[4]

Rejecting the implied representation argument that the use of a credit card is an implied representation of intent and ability to pay, the court in *Murphy* held that said use

---

4. The Supreme Court explained that the Restatement (Second) of Torts was the most commonly used guide for common law principals in 1978. "[W]e look to the concept of 'actual fraud' as it was understood in 1978 when that language was added to § 523(a)(2)(A). Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act." *Id.* The Eleventh Circuit also turned to the Restatement (Second) of Torts in *In re Vann,* 67 F.3d at 282, to determine the standard of reliance required by section 523(a)(2)(A).

is instead a promise to pay in the future which is actionable under common law fraud only if the debtor never intended to fulfill that promise at the time that the promise was made. The court explained as follows:

> The Court does not agree with the implied representation cases that hold that the use of a credit card is also an implied representation of an ability to pay. One of the principal reasons people rely on credit is a present lack of ability to pay.... But the use of a credit card is a representation regarding future action. Under the common law a promise to perform a statement of future intention is actionable as fraud only if, at the time the statement was made, the debtor never intended to honor his statement. A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.

*Id.* (citations omitted).

The court then recognized that the more difficult question under section 523(a)(2)(A) is whether the debtor made the representation with an intent to deceive. The court first determined that *Field* mandates the application of the subjective standard rather than the objective (totality of the circumstance) standard under the common law of fraud, requiring inquiry into the debtor's state of mind at the time the representation was made. *Id.* at 332. Thus, the court rejected the application of the totality of the circumstances theory to find subjective intent.

As noted above, courts following the totality of the circumstances theory, often employ numerous factors to determine intent to deceive. Instead, the court in *Murphy* held that what courts really need to do when determining subjective intent to deceive is to "determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Id.* at 333. The court further concluded that "the fact-finding process is only clouded by copying a list of factors from other cases and weighing evidence according to how well it matches that list." *Id.* In summation the court resolved as follows:

> [T]he use of a credit card is a representation concerning the user's intent to perform an act in the future. That representation is fraudulent only when made without the present intention to perform. In other words, the debtor must not have intended to pay the charges when he or she made them. The debtor's intent is to be determined by all of the facts and circumstances. In the final analysis, a subjective test of intent to deceive must be applied.

*Id.* at 334.

Turning to the facts of the case, the court held that the plaintiff had not satisfied its burden of proof with regard to the element of intent to deceive. The debtor, a self-employed realtor, supplemented his income for many years by gambling and investing in the stock market. The debtor would finance his investments and gambling expeditions by taking cash advances on his credit cards. In 1994, the debtor became unable to satisfy his credit card obligations when he entered into a loosing streak. Although the court found that the debtor knew that he could never repay his credit card indebtedness solely from his income as a self-employed realtor, the court nevertheless found that the debtor intended to repay his obligations at the time the charges were incurred. The debtor subjectively believed that he could satisfy his current obligations based upon his ability to satisfy his credit card obligations with gambling proceeds as he had successfully done on previous occasions.

In summary, the theories for determining the requisite intent for non-dischargeability of credit card debt under section 523(a)(2)(A) are as follows:

1) The *implied representation theory* finds false intent by the mere use of a credit card. Thus, this theory presupposes the existence of the debtor's representation of intent and ability to pay. This relieves creditors of one of the burdens of proof for fraud. Implied fraud is not a basis for non-dischargeability actions because actual fraud is required for a determination of non-dischargeability.

2) The *assumption of the risk theory* finds false intent only where authority to use the credit card has been revoked. This theory

places the creditor in an intolerable position with reference to pre-revocation charges wherein the debt is deemed non-dischargeable only where the cardholder continues to use the card *after* receiving notice of the issuer's revocation of the card.

3) Under the *totality of the circumstances theory* the creditor is required to prove the cardholder's intent to deceive by the examination of a list of objective factors. However, the reasonable man test is not conclusive on the question of common law fraud, but only evidence from which lack of honest intent may be inferred. RESTATEMENT (SECOND) ON TORTS § 526 cmt. d (1976).

4) The *common law test* or *subjective theory* requires a court to determine whether the cardholder subjectively intended to deceive the issuer at the time the charges were incurred by examining all of the facts on a case by case basis.

■ Although this Court believes that the totality of the circumstances theory provides a better approach to solving the dilemma presented by credit card discharge cases than the assumption of the risk and implied representation theories, the Court is inclined to reject each of these theories, and, instead, adopts the subjective common law test.

■ With regard to the facts of the present case, the Court finds that American Express has failed to prove that McKinnon had a subjective intent to deceive at the time that she incurred the obligations to American Express. Objectively, what McKinnon did may not meet the test of what a reasonable man would have done, but that test is not determinative. In the findings of fact and conclusions of law dictated into the record in open court at the conclusion of the trial, the Court ruled in favor of American Express finding that the use of the credit cards to finance her business venture was not a proper use of the cards pursuant to her credit card agreement. However, the Court also expressly found that McKinnon had an intent to pay when she incurred the obligations. She had an honest

belief that the book was going to be a success.

Upon reconsideration of the order entered on August, 11, 1995, the Court first finds that its original basis for denying the discharge of McKinnon's credit card obligations is not the determinative factor to be considered.[5] Instead, this Court must determine whether McKinnon made a false representation to American Express when she authorized various charges to be made to her American Express charge accounts, and whether she did so with an intent to deceive American Express.

As to the first element, McKinnon admitted that she authorized each of the charges to her credit card accounts i.e. she made a promise to pay (representation) in the future. Therefore, American Express has satisfied its burden of proof with respect to the first element under section 523(a)(2)(A).

However, with regard to the second and third elements, the Court finds that American Express has not proven by a preponderance of the evidence that McKinnon knowingly made a false representation with intent to deceive. Although the Court recognizes the difficulty in proving a debtor's subjective intent to deceive, the Court finds that the debtor did appear to be a very credible witness at trial. Although it is uncontroverted that McKinnon lacked the ability to repay the charges when made, the Court believes that she fully intended to repay the obligations and believed that she had an ability to do so in reliance upon her agreement with GPA and LKC.

■ McKinnon testified that the book on the history of the Russian space program was an excellent product that should have been successful. As this appears to have been McKinnon's first venture into the world of book publishing, McKinnon apparently based her belief in the success of the book upon her years of educational experience. McKinnon was also personally acquainted with Losev, the president of LKC, and conceivably believed in the success of the book based upon her trust and belief in Losev.

5. Although the credit card agreements expressly provide that the cards could only be utilized by the cardholder, the agreements clearly obligated McKinnon to pay for any authorized charges.

The Court likewise finds that her representations were not reckless enough to constitute fraud under the holding in *Birmingham Trust Nat'l Bank v. Case,* 755 F.2d 1474 (11th Cir.1985). Intent may be inferred from reckless disregard of truth, but the Court expressly finds that McKinnon's actions did not rise to a level of reckless disregard for the truth.

Accordingly, the Court finds that American Express has failed to establish by a preponderance of the evidence that McKinnon actually intended to deceive American Express when she authorized the charges to her accounts. Rather, the evidence demonstrates that McKinnon wholly believed in her ability to satisfy the obligations through the proceeds from her failed venture.

An Order in accordance with this opinion will be entered.