**In the Matter of Mark A. TOTINA, Debtor.**

**AT & T UNIVERSAL CARD SERVICES CORP., Plaintiff,**

v.

**Mark A. TOTINA, Defendant.**

Bankruptcy No. 95–13155.
Adversary No. 95–1227.

United States Bankruptcy Court,
E.D. Louisiana.

July 9, 1996.

Edward F. Bukaty, III, Bukaty & Fritch, Metairie, LA.

Phillip D. Rubins, Metairie, LA.

### MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came on for trial on May 30, 1996 on the complaint of AT & T Universal Card Services Corporation ("AT & T") to have credit card cash advances for gambling debts in the amount of $12,793.79 determined nondischargeable under 11 U.S.C. § 523(a)(2)(A). After listening to the evidence, reviewing the exhibits and pleadings, and considering the arguments of counsel, the court makes the following findings of fact and conclusions of law.

## I. *FINDINGS OF FACT*

### A. *Personal Information as to debtor*

1. The debtor is well-educated and has a well-paying job. He has a Bachelor of Science in Medical Biology and has had advanced medical diagnostic training at Ochsner Foundation. He has been employed since 1989 by Diagnostic Imaging Services, a medical diagnostic company, and has made steady advancements in his job. He is now a supervisor of MIR tests performed by this company.

2. The debtor testified that in 1995 he had a gross income of $42,000. The debtor is paid biweekly and has about $1,100 in take home pay every two weeks. He estimated his expenses were $1,000 to $1,200 per month, and testified that were it not for his gambling losses, he would have available over $900 per month to pay credit card debt.

3. Evidently the debtor has gambled for years. The oldest credit card statements in evidence, for the debtor's AT & T Universal Gold MasterCard ("MasterCard"), shows that the debtor incurred over $1,000 in gambling charges in October 1993, over $400 in November 1993, over $2,000 in March 1994, over $500 in April 1994, and then no more gambling charges until January 1995. (Ex. P–A).

4. The debtor testified that at the end of October 1994, he joined Gamblers Anonymous, attended meetings regularly at various locations and times, and did no gambling during that period.[1] Although the debtor did not gamble during this period, he still had not really acknowledged to himself that he had an uncontrollable gambling problem.

5. In December 1994, the debtor borrowed substantial sums from his parents and paid substantial sums on not only the two credit cards involved in this suit, but other credit cards as well. (*See* Ex. P–A, showing a payment of $2,000 on the MasterCard in November 1994.)

B. *The debts in question*

6. The debtor submitted applications to AT & T for both a Visa account and a Gold MasterCard. (Pl. 7, Pretrial Order at 2).

7. The debtor was issued two credit cards by AT & T Universal Cards Services Corporation. The first, the MasterCard issued under account number 5396 8090 0118 4212, was issued sometime in July 1993. (Pretrial Order at 2; Ex. P–A).

8. The second, issued on or about November 1994 under account number 4784 8000 0159 4693, was an AT & T Universal Gold Visa Card (the "Visa Card"). (Pretrial Order at 2; Ex. P–B).

9. The debtor started using the Master-Card on July 31, 1993 at which time he had a credit limit of $5,000 on the card. (Ex. P–A). The credit limit on this credit card had been raised to $6,500 in September 1993, to $7,500 in June 1994, and to $8,200 in March 1995. (*Id.*) As previously discussed, the debtor

was charging gambling advances during several of these months. (*See* Finding of Fact # 3). The debtor made at least the monthly minimum payments each month until May 1995, when he failed to make a $100 minimum payment. (*Id.*) In May, the debtor was notified his account was past due and he should refrain from using his card. (*Id.*) At that time there was a balance owed of $7,848.40. (*Id.*) The June billing statement notified the debtor that his account had been closed to further use. (*Id.*)

10. The debtor's credit limit on the Visa Card was $5,000 in February 1995, and was raised to $5,700 in April, 1995. (Ex. P–B). As of the end of May 1995, the balance owed on this credit card was $6,107.56. (*Id.*)

11. The debtor used the AT & T credit cards regularly and made minimum payments until May 1995. The debtor's accounts were kept fairly current until the debtor went gambling. (*See e.g.* Ex. P–A— statements of October 1993, March, 1994, and April 1994; Ex. P–B—statements of February and May 1995). After December 1994, 90% of the cash advances on the two AT & T credit cards were made for gambling purposes.

12. The debtor's gambling debts increased considerably in January 1995. The debtor was only able to make minimum payments on the two AT & T credit cards from January to May 1995.

13. Between May 5 and May 15, 1995, the debtor incurred seven cash advances on his AT & T credit cards totaling $6,685.93. (Pretrial Order at 2).

14. The debtor went to his employer in May 1995 and admitted that he had an uncontrollable gambling problem. The debtor cashed in 80 of the 120 hours vacation time he had accumulated. At the employer's suggestion, the debtor went to the employer's attorney, Sidney Cotlar ("Cotlar"), whose advice was made available to the debtor at no cost to the debtor. Cotlar advised the debtor that he was not a bankruptcy attorney, but that he knew that the debtor must either get

---

1. The debtor's testimony concerned the period from October to December 1994. The debtor made no advances to gambling houses on his AT

& T MasterCard from May through December 1994. (Ex. P–A).

consumer debt counselling or file for bankruptcy. The debtor testified that he was dead set against filing for bankruptcy and that he had not made up his mind to file bankruptcy when he left Cotlar's office.

15. The debtor then went to see Phillip Rubins ("Rubins"), his bankruptcy attorney, in May or June 1995, and discussed with him the filing of either a Chapter 7 or 13. After his visit to Rubins, the debtor took no more cash advances on either credit card and made no more payments.

16. On August 25, 1995, Rubins filed for Chapter 7 relief on behalf of the debtor. As of the filing date, the debtor owed $8,142.09 on the MasterCard, and $6,576.52 on the Visa Card. (Pl. 7, Pretrial Order at 2).

17. The debtor testified several times at the trial that he had always intended to pay AT & T for the cash advances, and that were it not for his gambling losses, he could have paid AT & T and his other credit card issuers 100 cents on the dollar.

18. In final argument, AT & T asked for a finding that the total amount of debt on both credit cards be calculated from January to May, 1995 as follows:

| | |
|---|---|
| Cash advances | $13,476.79 |
| Less payments made in this period | 683.00 |
| Total | $12,793.79 |

AT & T requests that the court declare the amount of $12,793.79 to be nondischargeable.

## II. *CONCLUSIONS OF LAW*

### A. *Burden of Proof*

■ The party seeking to establish that a debt is nondischargeable bears the burden of proof under Section 523 by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**2.** The "justifiable reliance" test from the *Field* opinion is equally applicable to all actions brought by creditors under Section 523(a)(2)(A)—"false representation, false pretenses, and actual fraud". *In re Alvi,* 191 B.R. 724, 730 (N.D.Ill.1996).

Because the Fifth Circuit has not yet addressed this question, this court assumes that the same test is applicable to all actions under Section

### B. *Section 523(a)(2)(A)*

Section 523(a)(2)(A) exempts from discharge a debt:

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, . . .

■ The terms "false pretenses, a false representation, or actual fraud" were not defined by Congress when it adopted Section 523(a)(2)(A). The Supreme Court, however, in determining the applicable standard of reliance under Section 523(a)(2)(A) for "actual fraud" [2], mandated the use of common law principles in holding that justifiable reliance was the requisite standard. *Field v. Mans,* — U.S. ——, ——, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995).

The debtor relies upon *In re Bercier,* 934 F.2d 689 (5th Cir.1991), as requiring a creditor urging nondischargeability of a debt to prove five elements. The Fifth Circuit in *Bercier,* quoting from *In re Roeder,* 61 B.R. 179, 181 (Bankr.W.D.Ky.1986), stated:

The actual fraud component of § 523(a)(2), insofar as it is relevant here, is explained by the *Roeder* court as follows:

a cause of action for fraud will exist under 11 U.S.C. § 523(a)(2)(A) when a debtor makes promises of future action which, *at the time they were made,* he had no intention of fulfilling. In order to succeed on this legal theory, the objecting party must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations. [emphasis in original].

523(a)(2)(A). This is important in the pending case because the complaint relies generally on Section 523(a)(2)(A) without specifying whether the debtor committed false pretenses, false representations, or actual fraud. The pretrial order does not narrow the issue. This opinion proceeds on the assumption that the same test is applied to all three stated grounds for nondischargeability under Section 523(a)(2)(A).

*In re Bercier,* 934 F.2d at 692. The debtor argues that AT & T's proof is lacking as to elements (2), (3), and (4). *Bercier* was a Section 523(a)(2)(A) case but did not involve either credit cards or gambling debts.

The debtor also relies upon the case of *In re Boydston,* 520 F.2d 1098 (5th Cir.1975), which did involve credit card debt, though not gambling debt, claimed to be nondischargeable under Section 17a(2) of the Bankruptcy Act, 11 U.S.C.A. § 35(a)(2). *Boydston* is not of much assistance to the debtor in this case because the Fifth Circuit simply affirmed on the basis of the clearly erroneous rule, the district court holding that had affirmed the bankruptcy referee. One portion of the *Boydston* case does, however, touch upon what this court perceives to be the real issue in this case, i.e. should a subjective or an objective standard be applied to determine the debtor's intention not to repay gambling debts.[3]

Although there does not appear to be a Fifth Circuit case [4] specifically holding that either a subjective or an objective test is applied to decide the debtor's intention of repaying credit card advances for gambling debts, there are a number of other cases, either cited by AT & T and the debtor or located by the court that fully discuss this problem. A review of the cases shows a wide divergence of opinion as to how credit card debts and especially gambling debts are to be treated.

### C. *Cases denying dischargeability of gambling debts*

It appears that no appellant court, other than the Ninth Circuit Bankruptcy Appellate Panel ("BAP"), has specifically addressed the question of how gambling debts charged to credit cards should be handled.

The case of *In re Karelin,* 109 B.R. 943 (9th Cir. BAP 1990), held that the debtor's use of her credit cards to obtain cash advances to support her gambling habits made the debts nondischargeable. The evidence in that case was so overwhelming in showing that the debtor's financial situation was so completely hopeless at the time she obtained the cash advances (in 18 months she lost $400,000) that the BAP could not find that the bankruptcy court's conclusion that the debtor did not intend to repay the debts was clearly erroneous. Although the debtor had a subjective desire to pay the debts, the BAP applied an objective test, but stated that it was not adopting a per se rule because it would unduly expand the "actual fraud" discharge exemption by attenuating the intent requirement. *In re Karelin,* 109 B.R. at 947–48.

Similarly, the case of *In re Eashai,* 167 B.R. 181 (9th Cir. BAP 1994), involved the standard to be applied to determine the nondischargeability of credit card debt, a small portion of which arose from gambling losses. The BAP held that the circumstances were such that the court could infer that the debtor could not reasonably have expected to pay the debt.

There are a great number of bankruptcy court opinions that have denied dischargeability of gambling debts by finding the intent to defraud based on the debtor's acceptance of cash advances without a reasonable basis to believe they could repay the debt. *See In re Nahas,* 181 B.R. 930 (Bankr. S.D.Ind.1994); *In re Adent,* No. 95–A–0016, 1994 WL 594259 (Bankr.N.D.Ill. Oct. 11, 1994); *In re Clagg,* 150 B.R. 697 (Bankr. C.D.Ill.1993); *In re Vermillion,* 136 B.R. 225 (Bankr.W.D.Mo.1992); *In re Bartlett,* 128 B.R. 775 (Bankr.W.D.Mo.1991); *In re Hansbury,* 128 B.R. 320 (Bankr.D.Mass.1991). *See also In re Davis,* 134 B.R. 990 (Bankr. M.D.Fla.1991) (Credit card debts incurred to purchase items, some of which were sold to

---

**3.** *See In re Boydston,* 520 F.2d at 1100, "Based on Sears and Niemann Marcus' failure to demonstrate Boydston's insolvency at the time the debts were incurred or to provide sufficient evidence of his *subjective* intent not to repay the debts, the discharge was granted." (emphasis added).

**4.** For an analysis of the implied representation of intent to pay, *see Davison–Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), *cert. denied* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941). *Davison–Paxon* is not further considered in this opinion because it did not involve credit cards or gambling debt and because its rationale had been severely eroded as early as 1975. *See In re Boydston* at 1101.

pay for lottery tickets, were nondischarge-able when debtor knew his financial situation and knew he would not be able to meet obligations without a large gambling win).

### D. Cases allowing dischargeability of gambling debts

There are fewer cases allowing discharge of gambling debts that are contested under Section 523(a)(2)(A) and of these few, some did not turn on the question of the debtor's intent to repay.

In the case of *In re Landen,* 95 B.R. 826 (Bankr.M.D.Fla.1989), the debtor received several large cash advances on his credit card and eventually exceeded his $500 line of credit by $4,796.86. The cash was admittedly used by the debtor to support his gambling habit. The court pointed out that it was bound by *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983), one of the leading Bankruptcy Act cases concerning discharge of credit card debt in which the Eleventh Circuit rejected the "implied representation" theory and held that the "voluntary assumption of risk" theory applied to credit card debt. *In re Landen,* 95 B.R. at 827–28. Because the creditor had not revoked the credit card on prior occasions when the debtor had exceeded his limit and had failed to revoke it prior to the debtor's filing of bankruptcy, the court could not conclude that the debtor had obtained the money by a false representation. *Id.* at 828. As to the creditor's alternative argument that the debtor had acquired the money by actual fraud, the court applied the five elements set forth in *Bercier, supra* at 676–677, and a litany of factors with respect to the debtor's alleged misrepresentation of his intention to pay. *Id.* at 829. The *Landen* court concluded that the debtor had the intention of paying his creditor when the withdrawals were made because (a) the debtor made the withdrawals some 50 days before filing bankruptcy; (b) the debtor had a well-paying job with a $2,500 monthly salary and appeared to be financially sophisticated; (c) although the debtor visited an attorney prior to making the cash withdrawals, it was not in

contemplation of bankruptcy; and (d) the court was "persuaded by defendant's honest but somewhat questionable belief that he would soon get lucky at gambling and pay off his debts". *Id.* at 829.

In the case of *In re Pressgrove,* 147 B.R. 244 (Bankr.D.Kan.1992), the court held that gambling losses charged on a credit card were dischargeable. The court applied the five elements set forth *supra* at 676–677 for proving actual fraud, and found that the creditor had not relied on the debtor's implied promise to pay for the charges incurred. The evidence showed the creditor had issued a pre-approved line of credit with a $6,000 limit on a Visa Gold card to the debtors with an application requesting only the debtors' names, addresses, employers, social security numbers, and salaries. The creditor introduced no evidence as to what kind of investigation, if any, it had made of the debtors' assets or the credit risks involved.

*In re Cox,* 182 B.R. 626 (Bankr.D.Mass. 1995), is not a gambling case because the primary cause of the debtor's inability to pay was illness of the debtor's daughter. The court in *Cox* held that Section 523(a)(2)(A) did not apply to misrepresentations of intent to pay when both the misrepresentation and lack of intent had to be inferred from the circumstances.[5] For purposes of the pending motion to dismiss, the court in *Cox* assumed that by May 1 the debtor had formed an intent not to pay and that the court could infer from the debtor signing a credit charge slip, a representation that the debtor intended to pay the charge. *In re Cox,* 182 B.R. at 628–29. The *Cox* opinion gives an extensive historical background of Section 523(a)(2)(A) by tracing its evolution from state court fraud actions to Section 17(a)(2) of the Bankruptcy Act.

*In re Murphy,* 190 B.R. 327 (Bankr. N.D.Ill.1995), is one of the clearest cases of an application of subjectivity to the question of intention to repay. At the outset the court stated:

the case involved a pre-approved credit card similar to the *Pressgrove* case, *supra.*

5. There was an alternate holding that the creditor had not relied on the misrepresentation as

The Court, however, must apply the common law principles of fraud and determine, from all the circumstances, whether the Debtor actually intended to stiff the plaintiffs when he incurred the debts, regardless of the reasonableness of his professed contrary intent. The evidence does not support such a finding. The debts are therefore discharged.

*In re Murphy,* 190 B.R. at 328–29.

*Murphy* presented strong facts calling for non-dischargeability of the debtor's gambling losses charged on the credit cards. The debtor filed his chapter 7 proceeding on February 27, 1995. *In re Murphy,* 190 B.R. at 329. He listed $213,103.76 in unsecured non-priority debt, all of which was credit card debt. *Id.* According to Schedules I and J, the debtor had a monthly income of $1,500 and monthly expenses of $1,460. *Id.* The Statement of Financial Affairs also indicated that the debtor had gambling losses of $180,-000 in 1994. *Id.* Most of his income had been from managing real estate owned by one client. *Id.* In 1993 the debtor reported income from the real estate business of approximately $28,626 and in 1994 income of approximately $33,000. *Id.* The debtor's gambling took two forms—betting on his golf game and investing in stock options, "an inherently speculative form of investment that the Debtor himself described as betting". *Id.* The evidence established that the debtor knew he could not have paid the credit card debt from the real estate business income alone, and that he needed to win at gambling to stay solvent. In February 1995, the debtor consulted an attorney about filing bankruptcy and filed later that same month.

*Murphy* discussed the origin and applicability of (1) the implied representation test from *In re Hinman,* 120 B.R. 1018, 1021 (Bankr.D.N.D.1990); and (2) the assumption of risk test from *Roddenberry, supra* at 678. *In re Murphy,* 190 B.R. at 331. The *Murphy* court rejected both of these approaches, and applied another approach—the common law of fraud.

Squarely facing the question of whether a subjective or objective standard is applicable to the issue of whether the representation of intention to pay was made with an intent to deceive, *Murphy* pointed out that some prior opinions had confused the two standards in credit card cases. *In re Murphy,* 190 B.R. at 326–27, *quoting, In re Berz,* 173 B.R. 159, 163 (Bankr.N.D.Ill.1994).

The *Murphy* court recognized that application of an objective standard to the debtor would have resulted in a conclusion that the debtor could not have reasonably believed he could continue to pay his substantial credit card debts. The court concluded, however, that the Supreme Court case of *Field v. Mans, supra* at 676, required it to apply a subjective standard. Application of that subjective standard led the *Murphy* court to conclude, contrary to most of the cases holding gambling debts are non-dischargeable, that the creditors had failed to prove by a preponderance of the evidence that the debtor actually intended to deceive them when he used the credit cards. *In re Murphy,* 190 B.R. at 334. Instead, the evidence showed the debtor honestly believed he would be able to pay his debts.

Another recent case, though not a gambling case [6] is an excellent opinion analyzing the elements of proof under Section 523(a)(2)(A). *In re McKinnon,* 192 B.R. 768 (Bankr.N.D.Ala.1996). The *McKinnon* opinion summarized the four theories applied in the case law for determining the requisite intent, i.e.: (a) implied representation; (b) assumption of risk; (c) totality of circumstances—objective factors; and (d) common law test or subjective theory. *In re McKinnon,* 192 B.R. at 771–74. The *McKinnon* court adopted the common law test or subjective theory primarily on the basis of the analysis by the *Murphy* court of the Supreme Court language in *Field v. Mans.* The *McKinnon* court concluded that the creditor had not proved the debtor intended to deceive the creditor when she authorized the charges on her credit card.

---

**6.** This case involved cash advances and charges of approximately $50,000 by a debtor under her American Express card to finance the publication

in English of a book on the history of the Russian space program—certainly a risky venture, if not gambling as such.

Another recent case agreeing with *Murphy* is *In re Alvi,* 191 B.R. 724 (Bankr. N.D.Ill.1996), a gambling case involving the use of an AT & T credit card as well as another credit card. The opinion finding dischargeability of the debt was based primarily on the failure of the creditors to prove they had justifiably relied on the debtor's representations. The court further held that the creditors did not prove the debtor's intent to defraud because the debtor intended to repay the debts and believed he could repay them when the debts were incurred. The *Alvi* court relied on the reasoning from *Murphy,* and pointed out that the use of the twelve factors cited by many courts in determining whether the debtor intended to repay did not address the most important issue—the subjective intent of the debtor to repay the debt, necessary for a finding of fraud. *In re Alvi,* 191 B.R. at 733.

The most recent case applying the common law test, or subjective theory, to determine if gambling debts were nondischargeable is *In re Jacobs,* 196 B.R. 429 (Bankr.N.D.Ind. 1996). Application of that test convinced the court in *Jacobs* that the debtors had the requisite fraudulent intent. The court's conclusion that Jacobs knew or should have known that they could not possibly pay for the charges and therefore perpetuated a fraud on the creditor was based upon facts and circumstances deemed admitted by the debtors' failure to respond to the creditor's request for admissions. The debtors did not appear at the trial and there was no testimony as to their actual intent.

■ On the basis of the cases discussed above, this court concludes that it will apply the subjective test to determine whether the debtor intended to pay the credit card advances he made on his two credit cards.

### E. *The debtor's subjective intent*

■ To determine whether the debtor had a subjective intent to pay requires a consideration of all the circumstances of the case at hand to determine whether the evidence leads to the conclusion that it was more probable than not that the debtor had the requisite fraudulent intent. Therefore, the court should not simply accept as sufficient the debtor's testimony that he intended to pay, not only his gambling debts, but all of his credit card debts and that he could have done so from his earnings were it not for gambling losses. This is so even though the debtor repeated the testimony at least twice, the testimony was uncontradicted, and the court finds the testimony to be credible.

■ Other facts brought out show that at the time the debtor made the advances, he intended to pay his credit card debts. The debtor attempted to break his gambling habit by attending Gamblers Anonymous and stopped gambling for a period of time. For example, although the MasterCard shows some advances for gambling debts in 1993, there was a long lull in which the debtor did not gamble. The credit card statement for the MasterCard shows no charges to gambling casinos from May through December 1994. (Ex. P–A). The debtor had borrowed $2,000 from his parents and by December 1994, he testified he had paid all of his gambling debts. He had reduced the balance on his MasterCard to $1,390.67 at the end of December 1994 (Ex. P–A) which was before he resumed gambling in January 1995.

At the time the debtor obtained most of the advances on his credit cards in the period from January to May 1995, he had an annual income of $42,000 which was more than sufficient to pay his credit card debt were it not for his gambling debts. The debtor made minimum payments on his credit cards until May 1955. The debtor drew no more advances on the credit cards after consulting a bankruptcy attorney. The debtor was employed throughout the time in question.

The total amount of the debt claimed to be nondischargeable by AT & T, $12,793.79, is not that large as compared to the debtor's annual earnings of $42,000. This makes more credible the debtor's testimony that he intended to and could pay, not only the amounts owed to AT & T, but all of his credit card debt, if he could simply stop gambling.

From all of the evidence, it is clear that the debtor is entitled to a discharge from the AT & T debt because AT & T has not carried its burden of proving by a preponderance of the evidence that the debtor did not intend to

pay AT & T at the time he made the charges on his credit card.

### III. *CONCLUSION*

That gambling debt should be dischargeable in bankruptcy provokes strong reactions. However this court may feel about the morality of the Bankruptcy Code permitting discharge of such debt, there is no statutory rule that the use of credit cards to incur gambling debts shows the requisite intent of a debtor not to pay his debts. A court trying a dischargeability case under Section 523(a)(2)(A) has to remember that the creditor bears the burden of proving by a preponderance of the evidence that the debtor did not at the time he took the advances intend to pay the credit card debt. If Congress intended that credit card advances for gambling losses be treated in any different fashion than any other debts incurred by an honest—albeit, misinformed, and always overly optimistic—debtor, it can always amend the Bankruptcy Code. Congress has shown no reluctance to do so in the past.[7]

On the facts of this case, the court holds that AT & T has failed to carry its burden of proving that the debtor made any misrepresentations to AT & T or had any subjective intent not to pay AT & T for the advances on the two credit cards. Judgment will be entered in accordance with this opinion.

---

7. The Bankruptcy Reform Act of 1978 contained 9 grounds for objecting to the dischargeability of a particular debt under Section 523. The present version of Section 523 contains 16 grounds.